Joseph P. AMRO, Plaintiff,

v.

The BOEING COMPANY, Defendant.

Civil Action No. 96–2147–KHV.

United States District Court,
D. Kansas.

Jan. 7, 1997.

U.S.C. § 2000e *et seq.*[1] The matter comes before the Court on *Defendant's Motion For Summary Judgment* (Doc. # 58) filed November 8, 1996. For the following reasons, the Court finds that said motion should be and hereby is sustained.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S:Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. at 2512.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but *must set forth specific facts. Applied Genetics,* 912 F.2d at 1241.

Dennis E. Egan, Bobbie R. Bailey, Popham Law Firm, Kansas City, MO, for plaintiff.

J. Steven Massoni, Mikel L. Stout, Gaye B. Tibbets, Foulston & Siefkin, Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff Joseph P. Amro, a senior engineer currently employed by The Boeing Company, brings suit for national origin discrimination in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.,* disability discrimination in violation of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12117, and retaliation in violation of 42 U.S.C. § 1981 and 42

---

1. Plaintiff originally asserted claims for breach of express and implied contract. Defendant sought summary judgment on those claims, and plaintiff did not oppose that aspect of the motion. The Court therefore finds that plaintiff has abandoned those claims, and also that defendant has shown good cause why its motion should be sustained. Defendant's motion for summary judgment is therefore sustained on the contract claims.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment maybe granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir.1988). Where the nonmoving party fails to properly respond to the motion for summary judgment, the facts as set forth by the moving party are deemed admitted for purposes of the summary judgment motion. D.Kan.Rule 56.1. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson* at 251–52, 106 S.Ct. at 2512. Ever mindful of these summary judgment standards, we now turn to the merits of defendant's motion.

### Statement of Undisputed Facts

From a judicial point of view, the difficult issues in this case are factual rather than legal. The task of understanding the facts has been daunting, and the Court's already laborious job has been considerably complicated by the manner in which plaintiff has presented its opposition to defendant's motion. D.Kan.Rule 56.1 provides in relevant part as follows:

> The memorandum or brief in support of a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the movant contends no genuine issue exists. The facts shall be numbered and shall refer with particularity to those portions of the record upon which movant relies.

> A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists.

> *Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies,* and, if applicable, shall state the number of movant's fact that is disputed. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party. The statements required by this subsection shall be in addition to the material otherwise required by these rules and the Federal Rules of Civil Procedure. (emphasis supplied)

In the *Revised Scheduling Order* (Doc. # 42) filed October 21, 1996, the Court also made the following specific order with respect to the format of summary judgment briefs:

> Counsel shall consult D.Kan.Rule 56.1 concerning the format of summary judgment motions and supporting memoranda. *If the party opposing summary judgment relies on any facts not contained in movant's memorandum, that party shall set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by D.Kan.Rule 56.1.* The moving party's reply brief (if any) shall respond to the non-moving party's statement of undisputed material facts in the manner prescribed in D.Kan.Rule 56.1. If the moving party does not so respond, the non-moving party's statement of undisputed facts shall be deemed admitted in the manner prescribed by D.Kan.Rule 56.1.

> *In responding to movant's statement of undisputed facts, the party opposing a motion for summary judgment shall first state the movant's numbered paragraph then the party's response to that numbered paragraph, to facilitate comparison.* If the party opposing summary judgment sets forth an additional statement of undisputed facts, the moving party's reply brief shall follow the same format. (emphasis supplied)

\*　　\*　　\*　　\*　　\*　　\*

> **The requirements of Rule 56, Fed. R.Civ.P., D.Kan.Rule 56.1 and this Order shall be strictly enforced.**

The scheduling order also notified counsel of the following requirements with respect to the format of summary judgment briefs:

> The separately numbered factual paragraphs in dispositive motions and opposing memoranda shall be construed as requests for admissions under Rule 36, Fed.R.Civ.P. Matters shall be deemed admitted if not controverted within the time established for the filing of opposing and reply memoranda. *If the responding party cannot truthfully admit or deny the matter, the response shall specifically set forth in detail the reasons why. All responses shall fairly meet the substance of the matter asserted.* (emphasis supplied)

It would scarcely be an overstatement to say that plaintiff has violated every rule in the book with respect to his brief in opposition to defendant's summary judgment motion. Plaintiff does not consistently refer with particularity to those portions of the record upon which he relies. When he relies on facts not contained in movant's memorandum, he does not set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by D.Kan.Rule 56.1. In responding to Boeing's statement of undisputed facts, he does not first state the movant's numbered paragraph, then his response, to facilitate comparison. Of even greater concern, plaintiff does not specifically set forth in detail the reasons why he cannot truthfully admit or deny particular matters, and he does not fairly meet the substance of the matters asserted.[2] These deficiencies are not merely technical in nature because they have so vastly compounded the Court's ability to separate the facts from the smoke and mirrors

in this case. To make things worse, plaintiff's brief abounds with missing exhibits, missing deposition testimony, missing cites to the record, incorrect cites to the record, hundreds of pages of documents that are never cited and have no apparent function in the record, lack of pinpoint cites to multi-page exhibits, and typographical errors.

In all of these respects, except as otherwise noted below, plaintiff has failed to specifically controvert Boeing's statement of undisputed facts in a manner sufficient under D.Kan.Rule 56.1 to raise genuine issues of material fact. In finding that the following facts are undisputed, the Court disregards all facts not set forth in compliance with D.Kan. Rule 56.1.

The undisputed facts are as follows:

Plaintiff Joseph P. Amro, a male of Lebanese national origin, is a naturalized United States citizen who was born in Lebanon. He obtained a B.S. degree in mechanical engineering from Wichita State University (WSU) in May, 1984, and on October 15, 1984, he applied for an engineering position with Boeing in Wichita, Kansas. At the time, plaintiff was not a United States citizen. Plaintiff sought employment as an analyst in tool engineering, a tool designer or a planner, and Boeing hired him in December, 1984, as a "Planner 4–NC Programming" at a starting salary of $20,800.00 per year.

Plaintiff had begun work on a Masters' degree in mechanical engineering before Boeing hired him and he continued his graduate coursework at WSU while working as a full-time employee at Boeing. On September 6, 1985, plaintiff applied for tuition assistance from Boeing.[3] Several different supervisors approved plaintiff's requests, and Boeing reimbursed his tuition and book costs.

---

2. If the Court were interested in assessing sanctions, it would not hesitate in finding some of plaintiff's responses so deficient as to permit only the conclusion that they were made in bad faith.

3. Boeing reimburses tuition costs incurred by employees who choose to continue their education. Written policy, as stated in the Boeing Employee Handbook from 1991, is that:

> Human Resources Development provides training and developmental training in order for the Company to stay current with changing

technology and to make certain a high level of employee expertise persists throughout each product line. Boeing employees must continually strive to change and adapt to the conditions that surround them. Therefore, the Company provides many off-shift, continuing education classes and assists employees in keeping abreast of their professional fields with a related college tuition reimbursement program.

In January, 1986, plaintiff accepted a position as a training equipment design engineer at Boeing's division in Huntsville, Alabama. At that time, Boeing upgraded plaintiff to the position of engineer and increased his salary by nearly $4,000.00, to $27,000.00 per year. Plaintiff worked in Huntsville from January 25, 1986 until August 22, 1988. While in Huntsville, plaintiff had a series of supervisors. He received good evaluations and was a lead engineer for part of that time. Throughout this time period, Boeing awarded salary increases to engineers through a selective salary adjustment (SELA) exercise. Generally under the SELA system, Boeing ranked engineers by performance, relative to other engineers in the same skill or job code. The output of that process was a performance totem, or so-called "B" totem, in which Boeing ranked engineers by performance value with the best performers at the top and the lowest performers at the bottom. During 1987 and 1988, plaintiff ranked 45 out of 59 engineers and 46 out of 59 engineers, respectively, on the "B" totem.[4] Based on that ranking, he received selective salary adjustments (raises) that brought his salary to $30,150.00 per year in November, 1987. Plaintiff's supervisors in Huntsville made no specific promises to him concerning his career path, potential promotions or future raises at Boeing.

In 1988, Boeing phased out the military projects on which plaintiff had worked in Huntsville. It therefore gave plaintiff, along with other engineers, the opportunity to transfer to Wichita or Seattle in lieu of being laid off. Plaintiff chose Wichita because Wichita was his home and the cost of living was cheaper there. When plaintiff returned to Wichita in August of 1988, he initially worked as a liaison engineer. He was the "focal point" for his group, and Dennis Roat was his supervisor. As "focal point," plaintiff trained new engineers, gave out new work packages, and helped, supported and directed other engineers within the group. Plaintiff ranked 21 out of the 27 DM1 skill code engineers on the "B" performance totem.[5] He therefore received two additional SELA increases that brought his annual salary to $32,150.00 in December, 1989.

Since December 6, 1989, plaintiff and other professional engineers at Boeing Wichita have been in a bargaining unit subject to a series of collective bargaining agreements. Under the collective bargaining agreement in effect from 1989 until 1992 (1989 CBA), Boeing reviewed engineers' salaries twice each year. Boeing agreed to establish a fund for selective salary adjustments at the end of each review period based on a percentage defined by the 1989 CBA, multiplied by the total bargaining unit salaries on the ending date of the review period, less increases already granted to eligible employees during the review period. The 1989 CBA required Boeing to increase the *mean base salary* of the bargaining unit by at least 2%, but individual salary increases were determined by recommendations from the employee's supervisor.

From August of 1989 through October of 1990, plaintiff worked in structural engineering under the supervision of Jim Hedden. Plaintiff was new to the area and Hedden regarded him as a trainee. One of the key elements of plaintiff's job was communication and, although Hedden regarded plaintiff as a competent performer, Hedden was concerned that plaintiff had a problem with both oral and written communications on account of his

4. From the "B" totem, Boeing extracted information to prepare a so-called "A" totem. The "A" totem reflected plaintiff's placement on a totem *within a given salary grade*. As of May 16, 1987, plaintiff's "B" totem included 59 engineers, 20 of whom were in salary grade 10. Of the 20 engineers in Grade 10, plaintiff ranked sixth from the top in salary. On November 16, 1987, plaintiff's "B" totem still included 20 engineers in Grade 10, and plaintiff ranked seventh from the top in salary. The "A" totem compared plaintiff's salary to the salaries of others within the same salary group; because it was not a measure of performance, however, its significance to this dispute is unclear. Plaintiff does not dispute where he ranked on the "B" totem. Apparently plaintiff's point is that he did not stack up as poorly when measured against others in the same salary range.

5. For whatever relevance it has, plaintiff ranked fifth out of 11 engineers in salary grade 10 on the "A" totem.

language.[6] Hedden and the lead engineer assisted plaintiff, however, and plaintiff resolved the problem.[7] *Deposition of James Hedden* (October 16, 1996) at 9–10. Although Hedden cannot now recall any performance issues with plaintiff, plaintiff ranked 114 out of 128 on the "B" totem for DL1 skill code engineers as of December, 1990, and he did not receive a salary increase in 1990.[8]

Neither Roat nor Hedden made any promises to plaintiff concerning promotions or salary increases. In 1989, however, while plaintiff was working under Hedden, plaintiff's second level supervisor Charles Konkel encouraged plaintiff to continue his education and said that plaintiff would have potential growth and "grow up" with the company. In late 1988 or early 1989, Konkel even suggested the subject of paint removal for plaintiff's Masters' thesis and said it would pay off for him in the long term. Konkel did not make any specific promises, however, about plaintiff's future salary increases.

Plaintiff earned his Master's degree in December, 1989. Boeing did not require a Masters' degree for design engineers in plaintiff's area (the struts design area), however, and consistent with Boeing's policies and practices, plaintiff did not receive any change in engineering assignments or responsibilities on account of the fact that he had earned his Masters' degree.[9]

Plaintiff worked under lead engineer Eric Fischer from October, 1990 until March, 1991. Fischer stated that plaintiff had done a "good job" on his first assignment. Plaintiff requested and thereafter received a job skill code change to DS4, design structures engineer.

On February 15, 1991, plaintiff transferred to a group under the supervision of David Martin. Martin testified that during the first year of supervision, he noted specific instances where plaintiff's performance was below average; after his training, plaintiff had a "learning curve" in using CATIA, a computer design tool; and some of plaintiff's work did not meet requirements and had to be redone.[10] Martin also testified that plaintiff had problems understanding directions and requirements given to him by his lead engineer. According to plaintiff, however, his lead engineer (Doug Ritter) said that his performance was above average. Plaintiff received a 5.6% salary increase in June of 1991 and a 5.3% salary increase in December of 1991, bringing his total salary to $35,750.00. At that time he went from a Grade

6. Plaintiff disputes Hedden's allegation that he had communication problems, but by plaintiff's own admission, as explained in his affidavit:

> On certain occasions I was told that I needed to work on my communication skills. Those comments were the result of the fact that I am not a native english [sic] speaker and speak english [sic] with a heavy accent.

*Affidavit of Joseph P. Amro In Opposition To Defendant's Motion For Summary Judgment* (Doc. # 87) filed December 9, 1996 at 6, ¶ 10(h).

7. Plaintiff's accent did not create any difficulties as far as designing aircraft or aircraft parts. According to Hedden, the communication concern was not a "major problem," and he did not mention it in plaintiff's performance review.

8. Plaintiff ranked 45 out of 55 on the "A" salary totem in December, 1990.

9. Plaintiff claims that throughout his employment, management "continually told him" that obtaining an advanced degree in mechanical engineering was "an important measure of his importance and value to Boeing." As evidence of that claim, he cites only his conversations with

Konkel (two in number) to the effect that if plaintiff used paint removal as the subject of his Masters' thesis, the subject would be helpful to Boeing and would "pay" for plaintiff "on a long term." *Deposition of Joseph P. Amro* (August 22, 1996) at 123. Plaintiff apparently had an "executive interview" with Konkel at some later time, and at that meeting, Konkel allegedly encouraged plaintiff to continue his education and research in the area of paint removal and committed that Boeing would pay for the research and data because "we see a lot of things in the future regarding the subject which could be beneficial to the company." *Id.* at 130. According to plaintiff, Konkel hold him that Boeing would recover its investment in plaintiff's education, by virtue of his increased technical knowledge and skills, and plaintiff would have a better future with Boeing, by virtue of his increased potential for growth. *Id.* at 131–32.

10. Martin did not note specific deficiencies in plaintiff's performance management review for that period, and he also did not mention that plaintiff had any difficulty with the CATIA system. Martin did not regard the communication issue as a serious problem and he does not recall talking to plaintiff about it.

10 to a Grade 12.[11] The salary adjustment for December (an increase of $1,800.00 per year) represented average performance. Engineers who demonstrated superior or above average performance normally received higher raises and those who were below average in performance received less than 5% or no raise at all. During this period, Martin based his salary recommendations on personal observation of the employee's job performance; communication with the lead engineer; the employee's overall work in the engineering group; the employee's overall work in the team environment; and observation of skills such as presentation skills, articulation skills, communications skills, attendance, attitude, and punctuality.[12] As far as Martin was concerned, plaintiff received pay commensurate with his work when he worked under Martin.

From December, 1992 to December, 1995, plaintiff was a member of the collective bargaining unit that was represented by WEA Professional Lodge 2020, affiliated with District Lodge 70 of the International Association of Machinists and Aerospace Workers ("the union"). In the Collective Bargaining Agreement in effect from December 6, 1992 until December 5, 1995, (1992 CBA), Boeing agreed to set aside funds for salary increases for engineers in the amounts of 4%, 5% and 5% respectively for annual review periods ending in March, 1993, March, 1994 and March, 1995.

Following labor negotiations in 1989, Boeing began to look at new and improved ways of dealing with compensation questions for evaluating performance and how to pay for performance. The result of the effort was the Compensation/Pay for Performance system (C/PfP),[13] which Boeing began to use in 1991. The C/PfP system has evolved since 1992 as the result of input from annual C/PfP Surveys conducted by Boeing, which provides feedback from employees and managers.[14] Generally, under the C/PfP system

11. According to plaintiff, Martin at some point told him that he should have been a Grade 14 rather than a Grade 10. The cited support for this contention (*Deposition of Joseph P. Amro* (August 22, 1996) at 155) is not included in the record. Also according to plaintiff, Martin told him in late 1991 or early 1992 that he had tried to put plaintiff into the computer for a salary adjustment to a Grade 14 but that there was a problem with the software; therefore, instead, plaintiff had received a raise within Grade 12. According to plaintiff, Martin also said that he did not understand why plaintiff was where he was on the salary curve, but that he would take plaintiff's future performance into consideration. As a result of these statements by Martin, plaintiff talked to Ken Zeigler, the functional manager for engineers in plaintiff's job code. Zeigler did not promise plaintiff a specific salary or raise, but said that he would talk to Human Resources to see if the software could be fixed.

12. Martin said that during the period he supervised plaintiff, Boeing operated under a "work performance review" system which "managed raises" as opposed to "managing salaries"—an approach which Boeing later adopted under the 1992 collective bargaining agreement. *Deposition of Thomas D. Martin* (October 15, 1996) at 17, 28. Under the system used until 1992, the supervisor compared the performance of each employee to the performance of other employees and recommended that merit raises from a merit pool be distributed accordingly. *Id.* at 21–22, 26, 28. In 1992, some time after Martin ceased his supervision of plaintiff, Boeing adopted its "compensation pay for performance" system—

which managed salaries based on the employee's worth to the company, as opposed to managing raises. *Id.* at 27–29. Martin did not perform the performance management function for Amro. *Id.* at 16. According to Martin, however, an employee's salary under the old system was determined by recommendations from his supervisor, while the new system envisioned a "specific correlation with absolute performance." *Id.* at 26.

13. Plaintiff disputes that C/PfP "improved" the compensation system because he does not believe that it accurately measures actual performance of engineers relative to their peers, and he believes that it incorporated the subjective biases and beliefs of managers and supervisors.

14. For example, Boeing mailed the 1994 C/PfP Survey to all of its engineers and 622 (51%) returned responses. Survey responses demonstrated that engineers supported the company's basic approach to compensation, in that they agreed that Boeing should have a performance-based compensation system and that it was fair to make salaries a function of years of experience and performance relative to peers, but that many engineers did not trust management to assess their performance. Over 55% of the surveys returned had written comments, and 112 of the comments articulated the general theme that the system was flawed because "management does not make unbiased [sic], objective performance assessments." The prevailing sub-themes were that (1) "there is too much politics (favoritism, personalities, etc.) in the process"; (2) "[s]uper-

(like the earlier SELA system), Boeing ranks engineers by their performance relative to peers in the same skill or job code. Peer groups are determined by grouping engineers with similar "BS equivalent years." "BS equivalent years" represent the number of years the employee has *performed* engineering work since obtaining his degree—not simply the number of years since he obtained the degree.[15] The output of that process is a performance totem, called a "B" totem, in which engineers are ranked by performance value with the best performers at the top and the lowest performers at the bottom.[16] When Boeing introduced the C/PfP system, supervisors made head-to-head performance comparisons of engineers in the same experience peer group, ranking employees in each skill code using a numerical system with the poorest performer at 1.0 and the best performer at 12.0. Boeing then put the performance rankings of all the engineers into the C/PfP system, and generated a performance totem, or so-called "B" totem. Boeing then allocated the selective salary adjustment fund among eligible employees. Under this process, an employee's length of service with Boeing does not entitle that employee to a certain salary.

Prior to each selective salary adjustment or C/PfP exercise, during each of the relevant time periods, totem captains received specific instructions and guidelines on the conduct of the exercise. The totem captain provided instructions to line managers and facilitated the totem exercise, but line managers determined the actual performance rankings. Boeing reminds totem captains and supervisors of Boeing's nondiscrimination policies and instructs them that comparative performance evaluations must be based on objective assessment of job performance and achievement of assigned responsibilities.[17] Individual performance rankings are determined after a lengthy process, beginning with individual supervisors obtaining input from lead engineers and internal customers. The 15 to 20 supervisors who had engineers within a given skill code or peer group then met to compare each engineer on

visors are not familiar enough with the engineers' capabilities and performance"; and (3) "[t]he process is too dependent on the relative debating skills of the supervisors involved."

15. Without citation to facts of record in this case, plaintiff complains that "in many cases [including his own] the defendant failed to follow its own rules pertaining to 'BS equivalent years'." Plaintiff specifically avers that Boeing incorrectly calculated his BS equivalent year, to his detriment, and that as a result plaintiff is ranked in the wrong peer group. While plaintiff cites Deposition Exhibits 9, 34, 35, 50, 53, and 54 as support for this proposition, the Court cannot discern how they support plaintiff's contention. Similarly, plaintiff's allegation that "[o]ther similarly situated engineers had BS years calculated incorrectly to their benefit, which resulted in greater salary increases" finds no support in the record.

16. Plaintiff claims that while Boeing's C/PfP system purports to rank engineers by performance, it does not reach that objective. In that regard, he cites various attributes of the computer software which Boeing initially utilized in 1992: (1) the fact that the original software allowed managers to adjust proposed target salaries by manually overriding the C/PfP software; (2) the fact that the "B" totem is "actually a comparison of target salaries relative to other employees and is dependant [sic] upon a number of inputs including: prior salary, years of experience, performance rankings, adjustments to the curve spread parameters, and manual 'indexing' of target salaries"; and (3) the fact that "the first software edition was designed to automatically 'normalize' the raw scores to create a more even distribution of rating scores." The relevance of these observations is anyone's guess. Plaintiff does not purport to demonstrate how the computer software influenced the substantive decision-making process to his detriment or that of anyone else.

Likewise, the Court cannot discern any relevance to plaintiff's observation that in the fall 1992, the toteming process was changed so that an individual's ratings were not changed from the previous exercise unless the managers and supervisors specifically changed the rating; or the purported fact that these changes allowed managers to base peer ratings on head-to-head comparisons (i.e. "who deserves the higher target salary?") or on judgments regarding who is the higher percentile performer.

17. Plaintiff complains that the record contains no evidence that prior to 1993, Boeing communicated its nondiscrimination policies to line management and supervisors who were making the decisions concerning performance and salaries. By the same token, however, plaintiff presents no evidence that managers and supervisors were unaware of Boeing's nondiscrimination policies, and plaintiff cites no evidence that managers and supervisors violated those policies in performing the C/PfP exercise in June of 1992.

a one-on-one basis with all other engineers in that group.[18]

In 1992, plaintiff returned to Huntsville to face an outstanding fugitive warrant. Plaintiff initially requested leave without pay, which Martin approved. This leave was later canceled because plaintiff and Boeing agreed to a temporary job assignment for plaintiff in Huntsville beginning May 3, 1992, thus allowing plaintiff to earn a salary while he dealt with the criminal case.[19] The Interdivisional Work Authorization was initially expected to last 60 to 120 days but the parties extended it to approximately six months, until August 21, 1992.[20]

While plaintiff was in Huntsville, in June of 1992, Boeing conducted its initial C/PfP performance totem exercise for engineers. Plaintiff claims that some time prior to June 8, 1992, he spoke on the telephone with R.A. McKenzie, whose identity is not immediately evident on this record. According to plaintiff, McKenzie told plaintiff that he would have a "big increase to commensurate [sic] with [his] education and [his] experience," and that "[his] accomplishment will be award [sic] by [his] management in Wichita." According to plaintiff, McKenzie also told him that he was going to talk to someone in Wichita about the matter. Notwithstanding the conversation with McKenzie, plaintiff's absence did not have a positive effect on his performance ranking. On the "B" totem for June of 1992, he ranked 278 out of 289 engineers[21] and he therefore did not receive a merit increase.[22]

After he returned from Huntsville in late August of 1992, plaintiff asked Martin about the status of his effort to put plaintiff into the software at a higher salary, see footnote 9, supra. Martin replied that he had not yet received an answer from upper management, but on December 6, 1992, the effective date of the 1992 CBA, plaintiff and other engineers received an automatic 2% increase. This increase brought plaintiff's annual salary to $36,450.00. At the end of 1992, Martin described plaintiff's work performance in Wichita as "satisfactory"—an average indicator meaning that plaintiff had no outstanding performance deficiencies; his performance was less than extraordinary, superior or exemplary, but better than unsatisfactory or below average. Martin also indicated that plaintiff needed to improve his understanding of Boeing's drawing revision system, improve his communications with his lead engineer and design build team members, and obtain a clear understanding of all requirements prior to and during design preparation.[23]

On December 19, 1992, plaintiff earned his Ph.D. in mechanical engineering. Boeing paid all tuition, books and lab fees towards plaintiff's Ph.D., although an advanced degree was not necessary for plaintiff's job performance.[24] At about this same time,

---

**18.** Plaintiff admits that in June, 1992, the process used some head-to-head comparisons, then argues that the process has evolved to its present form, which emphasizes target salary adjustments rather than head-to-head rankings.

**19.** Boeing gave plaintiff a $4,200.00 travel advance for all of plaintiff's travel and living expenses while he was in Huntsville. Plaintiff's wife and first child remained in Wichita and defendant paid travel expenses so plaintiff could visit his family.

**20.** Plaintiff's absence from Wichita came at a time when defendant's Wichita division was experiencing a manpower crisis and was desperately seeking engineers. Although plaintiff claims that he was doing important work in Huntsville, he was not available during that time to perform work for the Wichita division.

**21.** Plaintiff ranked 71 out of 74 engineers in his salary grade, on the "A" totem.

**22.** The guidelines for the Spring of 1992 established target average increases for each performance category as follows:

| Performance Category | Average Increase |
| --- | --- |
| Superior | 2.6% |
| Good | 2.0% |
| Satisfactory | 1.2% |

**23.** Plaintiff complains that Martin's comments did not incorporate comments on his performance by his supervisors in Huntsville from May 3 to August 21, 1992. Plaintiff offers no evidence as to what their views might have been, however, or how they might have favorably influenced Boeing's evaluation of his performance.

**24.** Frank Vopat, manager of Labor Relations from September 1988 to January 1993, discussed this point with plaintiff in early 1993, just after plaintiff had received his Ph.D. Vopat told plaintiff that while an advanced degree could help an engineer because of the experience and knowledge that came with an advanced degree, "the

shortly after plaintiff obtained his Ph.D., plaintiff told Martin and Ken Zeigler, the functional manager for engineers in plaintiff's job code, that he had received a job offer from General Dynamics in Texas for more than $60,000.00 per year. Plaintiff claims that Zeigler agreed to "match the offer, maybe a little less," and that he would call Boeing's Human Resources department to take care of it.

At about this same time, in recognition of the fact that plaintiff had earned his Ph.D., Martin recommended to Zeigler—at least orally—that plaintiff receive an out-of-sequence pay raise.[25] Out of sequence raises are rare; they essentially take money out of the merit increase pool and they require some significant change in an employee's assignment, responsibility and performance. Ziegler told Martin that he could not justify the raise "on the basis of just getting an advanced degree," and he did not submit the request to the compensation department.

Also in December of 1992, at about this same time, plaintiff met with Robert Spitzer, Director of Engineering in Wichita, to discuss his situation at Boeing and the fact that he had earned his Masters' degree and his Ph.D. in mechanical engineering. Spitzer asked plaintiff to submit a letter stating "what did Joe Amro want to be." Plaintiff responded by sending his resume to Spitzer, along with a letter stating that he was "interested in an assignment as a principal engineer that will lead to a managerial position."[26] Shortly thereafter, plaintiff had a brief follow-up meeting with Spitzer. Plaintiff claims that Spitzer told him that he had "assigned Mr. Zeigler an action item for him to carry on," but the record does not disclose

what "action item" Spitzer had in mind, whether Spitzer in fact communicated any such "action item" to Zeigler, or what exactly constitutes an "action item". According to plaintiff, Spitzer concluded by stating that plaintiff would "be okay." In a third conversation on the telephone, several weeks later, plaintiff told Spitzer that he had already met with Zeigler and that Zeigler "has not done anything regarding my situation in the past." In response, Spitzer allegedly told plaintiff not to worry, that everything would be okay. By the same token, however, Spitzer did not promise plaintiff a specific promotion or salary increase.

In January, 1993, the structural design work which plaintiff had been doing under Martin was largely complete. Therefore, on January 8, 1993, plaintiff moved to the 777 strut design area under Joe Kowing. Kowing participated in the C/PfP exercise that occurred prior to the March, 1993 salary adjustments. Plaintiff did not stand out in Kowing's group and Kowing did not perceive that plaintiff provided leadership. Plaintiff pretty much stuck to his computer screen, not interacting with or helping other engineers. Based on plaintiff's short time in the area, Kowing ranked plaintiff toward the bottom of the list in terms of performance and experience. The salary increase fund for the review period ending March, 1993 was 4%. Effective March 2, 1993, plaintiff received a merit increase of $1,550.00, or a 4.25% increase. Kowing had been plaintiff's supervisor for a short time, however, and this fact received positive consideration so that plaintiff would not be short-changed for being new to Kowing's group. Plaintiff nonetheless

degree you have isn't necessarily a big influencing factor in the way you may perform or progress as an engineer [at Boeing]." *Deposition of Frank Vopat* (August 29, 1996) at 41. Vopat made the point to plaintiff "a number of times" that "there wasn't any direct recognition of [achieving an advanced degree] in the pay for performance process." *Id.* at 57.

**25.** Martin was very familiar with the fact that Boeing did not compensate for advanced degrees, but he disagreed with company policy. *Deposition of Thomas D. Martin* (October 15, 1996) at 78. Martin claims that he requested the

out-of-sequence raise in writing but that Zeigler verbally denied it.

**26.** Plaintiff claims that he told Spitzer that he was willing to stay in Boeing's engineering department in Wichita, if he could have a job that was commensurate with his education and experience. He also claims that Spitzer told him that he had no problem with plaintiff's request for a position as a principal engineer that would lead to a managerial position. In support of these claims, unfortunately, plaintiff cites deposition testimony which the Court cannot locate in any of the voluminous records before it.

ranked 255 out of 281 on the "B" totem[27]—a ranking which placed him in the lowest 25th percentile of target salaries. Neither Kowing nor the other supervisors in the strut design area promised plaintiff any specific salary increase or promotion.

On April 14, 1993, plaintiff had a work-related accident in a catwalk over South Oliver street and he required hospitalization in the intensive care unit. Thereafter, plaintiff had a problem with fatigue, and physical problems left him unable to walk without a stick. Plaintiff had 20 surgeries for a nose fracture, and he experienced cross vision after severe fatigue. As a result, plaintiff was on approved leave of absence for approximately five and one-half months, beginning April 15, 1993. On October 29, 1993, he returned to the struts and nacelles organization and worked briefly under Hedden's supervision. Plaintiff's medical restrictions did not have a serious impact on plaintiff's ability to do his job. Plaintiff had no problems with Hedden and Hedden accommodated plaintiff's restrictions.[28] Plaintiff had been absent for more than 90 days of the preceding review year, however, and under the collective bargaining agreement he was ineligible to participate in the salary increase fund.[29] Boeing could have adjusted plaintiff's salary through an out-of-sequence adjustment (which is quite rare), but it did not do so. Even though plaintiff was not eligible to participate in the salary increase fund, Hedden evaluated his performance from October 29, 1993 until December 31, 1993. Hedden testified at his deposition that plaintiff is a bit hard to understand; that his ability to use CATIA was average; and that plaintiff had

taken over tasks from other designers and completed the designs on schedule with little direction and supervision, "which was an outstanding accomplishment." On the actual performance review for 1993, however, Hedden did not comment about plaintiff's communication skills or CATIA capability. Moreover, he did not consider plaintiff's communication problems to be noteworthy and he did not talk to plaintiff about them. In late 1993, plaintiff met with Les Platz, personnel manager, and Frank Vopat, a senior human resources manager, to discuss his educational attainment, his concerns about not having a job that more fully utilized his training, and his view that his "BS equivalent years" were incorrectly entered in Boeing's computer system. Platz told plaintiff that Boeing's recognition of advanced degrees was limited to reimbursement of tuition, and that Boeing did not recognize the attainment of a Ph.D. or any other advanced degree in computing merit increases for engineers. Platz told plaintiff that he "did not have any money in his hat" to give him, and he never promised plaintiff any raise or promotion.

Plaintiff met with Vopat again, in April of 1994. Vopat explained to plaintiff that his Ph.D. was not necessarily a big influencing factor in the way he performed or progressed as an engineer in defendant's system. Plaintiff claims that Vopat agreed to correct the record concerning plaintiff's "BS equivalent years" and to make sure that all of plaintiff's performance reviews and a copy of his Ph.D. degree were in his file. Vopat and Platz later checked the system and confirmed their view that it correctly reflected plaintiff's "BS equivalent years."

**27.** He also ranked 41 out of 48 engineers in his salary grade, on the "A" totem. Plaintiff claims that his numerical rating did not accurately reflect his performance relative to his peers, but he cites no evidence apart from his personal belief and conclusions in this regard.

**28.** Plaintiff's temporary medical restrictions, when he returned from this first leave of absence, were as follows:

 a. May never climb stairs;
 b. No work in high noise level area (more than 85DB);
 c. May use medical parking;
 d. No work requiring sharp vision.

**29.** The 1992 CBA, in effect at the time of the merit evaluation in March of 1994, provided as follows:

*"11.1(b)(2) Following the ending date of each of the three selective salary adjustment review periods, the Company will, as required, increase the base salaries of employees selected from among those who are eligible.... Eligible employees, in this instance, are those who were continuously in the bargaining unit and on the active payroll during the inclusive dates of the selective salary adjustment periods and those who were on approved leave of absence for 90 days or less but who were active employees on the ending date."* (emphasis added)

In February, 1994, Hedden had returned to the 737 project in Seattle and Kowing again supervised plaintiff. At that point, Kowing talked with Hedden and plaintiff. He understood that plaintiff was having trouble with headaches and staying focused on the CATIA screen, and he told plaintiff that he would honor whatever agreement plaintiff had with Hedden.

Beginning May 20, 1994, and for seven weeks thereafter, plaintiff worked in the fuselage structures design group under Terry Nunemaker. During that period, Nunemaker gave plaintiff special assignments that did not require him to use a CATIA screen for extended periods of time, and he essentially created a special position, which did not normally exist, for plaintiff. Nunemaker never refused to give plaintiff time off and he did not do anything which plaintiff considered to be unfair or discriminatory with respect to time off. On June 29, 1994, Nunemaker approved a second leave of absence for plaintiff, beginning July 1, 1994. Nunemaker did not supervise plaintiff long enough to make a judgment about his performance. Moreover, because Boeing did not conduct a merit exercise while Nunemaker was his supervisor, Nunemaker did not participate in a performance or merit totem involving plaintiff. He did give plaintiff a year-end performance evaluation which stated that plaintiff was doing a "good job" but raised concerns that plaintiff's "ability to meet program goals was severely affected by [his] physical disability which resulted in an extended medical leave of absence."

In November, 1994, plaintiff was released to return to work from his second leave of absence, with the following *permanent* medical restrictions:

a. May use medical parking;

b. May occasionally (0–33%) climb stairs;

C. No work in high noise area (more than 85DB);

d. May walk 66 yards at a time;

e. No climbing ladders;

f. 15 minutes away from desk each hour;

g. Use of computer screen not greater than 50% of shift.

In addition, one of plaintiff's physicians stated that plaintiff would need a break from computer work every 30 minutes.[30]

When plaintiff returned from his second leave of absence, the special assignment and other work that plaintiff had performed under Nunemaker was complete. Also, about 80% of the work in Nunemaker's design group involved computer use; engineers had to work for extended periods on computers to define an airplane, to create a data set of drawings that are done on a CAD or CATIA screen. As a result, plaintiff could not return to work for Nunemaker.[31] Therefore,

---

**30.** Amy Prohaska (then Weber) provided contract services for Boeing and IAM Cares and, given plaintiff's medical restrictions, she began working with plaintiff in November of 1994, to return him to a job that he could do. Because plaintiff was anxious to go back, she worked several potential placements simultaneously to expedite his return to work. She did a job analysis on a potential placement in the stress department, and she talked to the manager of that area. Prohaska also talked to the functional manager of MRB (Materials Review Board) positions, but plaintiff had not passed the MRB exam. An MRB exam was not required in Floyd Tiffany's area, so Prohaska performed a job analysis of the senior engineering position in that area. Boeing asked Tiffany if he had a place in his liaison engineering group where plaintiff could work during his rehabilitation, and assigned him to Tiffany on December 22, 1994.

Plaintiff, Prohaska and Tiffany approved a rehabilitation plan as part of plaintiff's workers' compensation claim. As far as Prohaska knew, plaintiff's return to work was successful. She made the decision to place plaintiff in Tiffany's position because it met plaintiff's qualifications and it was the first available opening in a senior engineering position that met plaintiff's medical restrictions.

**31.** Plaintiff argues that he could have returned to Nunemaker's group, but the record permits no reasonable inference to that effect.

Plaintiff complains that no one "told" him that his restrictions prevented him from returning to Nunemaker's group. In this regard, however, he relies upon deposition testimony that he does not include in the record.

Plaintiff complains that in the past, Nunemaker had not assigned him CATIA work. Again, however, he relies upon deposition testimony that he does not include in the record.

Plaintiff complains that engineers who were not CATIA-capable worked for Nunemaker. The record does in fact reflect that as of *October 15, 1996,* Nunemaker supervised three engineers

beginning December 22, 1994, plaintiff went to work for Floyd Tiffany in a liaison engineering group. Plaintiff worked under Tiffany until Tiffany left Boeing on April 1, 1995. Tiffany helped plaintiff develop his goals for 1995, but he left before plaintiff's performance review for 1994.

Since April, 1995, Randy Henley has supervised plaintiff in the liaison engineering group. Initially, Henley noted areas that plaintiff had to improve; in particular, he noted that "[s]ometimes the communication of the design issues ... would get muddled." Henley worked with plaintiff on improving communications within the team environment and with other functional organizations and customers, however, and his performance improved. The manufacturing engineering group (an internal customer of Henley's liaison group) had particular problems with plaintiff, and Henley's view was that "the apparent friction or communication issue" was an impediment to plaintiff's ability to perform as an engineer. At the time of plaintiff's performance evaluation in March of 1995, plaintiff ranked 169 out of 203 engineers in his skill code. He received a $1,000.00 salary increase.[32]

At the time of the performance evaluation in March of 1996, plaintiff ranked 279 out of 327 engineers and he received a $1,500 salary increase (bringing his annual salary to $40,500.00). Effective December 6, 1995, the bargaining unit became subject to a new collective bargaining agreement between Boeing and the Seattle Professional Engineering Employees Association (1995 CBA) which will be in effect until December 5, 1999. The 1995 CBA sets out yearly salary adjustment review periods and increase percentages of 4.0%, 4.0%, 4.5% and 5.0% for the years from 1996 through 1999. Plaintiff's raise in 1996 amounted to a 3.84% increase, close to the CBA's increase fund percentage of 4.0%.

Plaintiff complains that in the 1992 C/PfP exercise, Boeing established "no criteria" for managers to follow in evaluating performance. This allegation—which plaintiff reiterates for all toteming procedures up to 1994, is unsupported by the record.[33] In 1992,

who were not building or releasing CATIA data set drawings. *Deposition of Terry V. Nunemaker* (October 15, 1996) at 12, as corrected per Attachment 23, *Supplemental Attachments To Defendant Boeing's Reply Memorandum In Support Of Motion For Summary Judgment* (Doc. # 107) filed December 23, 1996. The relevant time period is December, 1994, however, and not October, 1996.

Plaintiff cites hearsay statements by Prohaska, concerning what Zeigler allegedly told her. Again plaintiff fails to document such testimony with evidence in the record.

Plaintiff complains that Boeing returned him to work not in a senior engineering position but as a drafter. In fact, however, the record reveals that plaintiff retained his Grade 12 salary and remained within the design engineer skill code. Initially, Tiffany was concerned that plaintiff had lost some cognitive ability as a result of his accident; he therefore assigned plaintiff drafting work as opposed to engineering work. Under Tiffany, several drafters worked for one engineer, who reviewed and signed off on production changes. *Deposition of Floyd Tiffany* (October 18, 1996) at 25–26. Whether that assignment persisted and if so, for how long, is not evident from the record.

Plaintiff finally complains that Boeing assigned him to a drafting position without even considering him for other positions that were available within his medical restrictions, *i.e.* his former position with Nunemaker and two senior level engineering positions that were not essentially drafting jobs. The record contains no evidence, however, that in November of 1994, when plaintiff returned from his second leave of absence, Nunemaker had an available position which was compatible with plaintiff's medical restrictions, *i.e.* "use of computer screen not greater than 50% of shift" and a break from the computer screen every 30 minutes. To the contrary, the record reveals that plaintiff's position with Nunemaker had been one created especially for him and that the work assigned that position had been accomplished. The record likewise contains no evidence that Boeing actually had two senior engineering positions which were available in December of 1994, within plaintiff's medical restrictions. To the contrary, the evidence is that plaintiff was "very anxious" to get back to work and that Boeing placed him in the position with Tiffany because it met plaintiff's professional qualifications, satisfied plaintiff's medical restrictions, and "materialized the quickest."

32. Plaintiff ranked 23 out of 25 engineers in his salary grade, on the "A" totem.

33. Plaintiff cites deposition testimony of Ken Zeigler (the Functional for DS4 engineers, including plaintiff) for the proposition that "in the 1992 exercise, there were no criteria established for managers to follow in evaluating performance." In fact, for the C/PfP exercise in June of 1992, Ziegler provided engineering managers

Boeing asked all supervisors of DS4 engineers to assess the employee's performance, to assess how well the employee had achieved goals he or she had set, to assess the employee's level of performance within the job, and to provide a performance listing of all of their engineers—with the outstanding performer ranked as a 1.0 and their least/poorest performer ranked as a 12.0. Written guidelines for totem captains stated that the comparative evaluations of employees and pay increase decisions had to be based on objective assessment of job performance and achievement of assigned responsibilities. Moreover, in the collective bargaining agreement, Boeing and the union agreed that relevant performance criteria included (but were not limited to) customer satisfaction, continuous quality improvement, initiative, productivity, overall technical competence, communication, teamwork, innovation, creativity, integrity and leadership.

Boeing codified these guidelines in the performance assessment instructions in late 1994 (see Deposition Exhibit 87). At that time, in preparation for the 1995 C/PfP exercise, Boeing distributed to both engineers and management a set of written guidelines on performance assessment, for the stated purpose of helping focus the totem meeting discussions on five key elements of "performance" and also helping to stimulate meaningful dialogue between engineers and management in the one-on-one meetings that occurred after the totem exercise. The guidelines broadly defined "performance" to include five elements, all of which related to an employee's "value to the company": accumulation of responsibility, accumulation of skills, leadership, quality and quantity of work, and attitude. Even given this codification in 1994, however, the record belies plaintiff's contention that prior to 1994, performance criteria "varied from manager to manager" or were non-existent.[34]

No part of Boeing's evaluation process has expressly recognized educational attainment as a criteria of work performance. Neither the SELA process nor the C/PfP process directly recognized attainment of advanced degrees, and an employee's attainment of an advanced degree does not result in salary adjustments or raises or, standing alone, influence an engineer's performance or career progress at Boeing.[35]

and supervisors a memorandum which admittedly did not articulate criteria that managers were to use in rating their engineers, but stated that "[a]t our first meeting I will explain the numbering system." The memorandum also indicated that the rankings would be used to construct a "bottoms up" list for use in the performance toteming process as well as a planned retention exercise. Zeigler testified that Boeing utilized "general principles that said it was to be done fairly," and that Boeing asked all supervisors of DS4 engineers to assess the employee's performance during the time period, to assess how well the employee had achieved goals he or she had set, and to assess the employee's level of performance within the job. *Deposition of Ken Zeigler* (August 28, 1996) at 45–46.

In addition, in the collective bargaining agreement, Boeing and the union agreed that relevant performance criteria included (but were not limited to) customer satisfaction, continuous quality improvement, initiative, productivity, overall technical competence, communication, teamwork, innovation, creativity, integrity and leadership. *Id.* at 47.

34. Plaintiff makes a big point of Hedden's testimony that Boeing did not distribute "Totem Captain Manuals" (such as Deposition Exhibit 54) to people who were not totem captains (*i.e.* line managers). The import of this testimony is unclear, especially in light of Hedden's testimony that totem captains received packages of information which they in turn distributed to first level managers. *Deposition of James Hedden* (October 16, 1996) at 36. Moreover, while plaintiff cites Hedden's testimony as support for the proposition that the rules and criteria "changed many times," Hedden in fact testified that *target salaries* "changed a bit" from year to year. *Id.* at 35.

As further evidence of the arbitrariness of the toteming process, plaintiff complains that Nunemaker did not participate in the 1994 toteming process for plaintiff "even though he was his line manager." Technically, Boeing assigned plaintiff to Nunemaker for seven months in 1994. Nunemaker only observed plaintiff for seven *weeks*, however, from May 20 to July 1, 1994, because plaintiff was on his second leave of absence from July 1 to December 22, 1994. *Deposition of Terry V. Nunemaker* (October 15, 1996) at 7–9. Nunemaker did not participate in the 1994 toteming process for plaintiff because the toteming process did not occur while plaintiff was under his supervision.

35. Nothing in the record suggests that Boeing treated plaintiff any differently than it treated other employees who received advanced degrees.

From 1993 though 1996, Boeing provided written guidelines to totem captains and management, reminding them of Boeing's nondiscrimination policies. Under the toteming process, individual supervisors cannot deviate from the guidelines because the performance exercises are done through management teams.

Today, plaintiff has no trouble walking. He has lower back pain after sitting "a while." He still has problem with fatigue "on and off." "Off and on," plaintiff has had pain in both sides of his nose and sinuses around his eyes; it has been months, however, since plaintiff had severe pain. Plaintiff had cross vision four or five weeks prior to his deposition and uses breathing, biofeedback and relaxation techniques to resolve these problems. He also experiences dryness in his eyes which he treats with over-the-counter medication. Plaintiff never told Prohaska that he felt Boeing was discriminating against him because of his medical impairments or national origin, or retaliating against him. As far as Prohaska knows, plaintiff was successfully accommodated in the position with Tiffany, and plaintiff's placement there was not retaliatory. Plaintiff now complains, however, that although his current position is a Design and Structures Engineer with a DS4 skill code, Boeing "demoted" him to the position of drafter in December, 1994 and he now receives only low-level drafting assignments and responsibility for which no degree is required. The record contains no evidence of any formal demotion, and plaintiff admits that he is paid and classified as a Grade 12 engineer. Moreover, plaintiff's affidavit acknowledges that some of his duties are ones which might be assigned to an engineer.

Plaintiff filed a grievance under the collective bargaining agreement, alleging that he had been required to make up time lost for doctor's appointments. Plaintiff received pay for a certain number of those hours, but claims that the issue is still up in the air.

Plaintiff claims that in March of 1994, he delivered a letter to Kim Scanlan, Boeing's Director of Internal Equal Employment Opportunity/Workforce Diversity, complaining of discrimination. He cites no record evidence in support of that claim, however, and he does not provide a copy of any alleged letter. Boeing has no record that plaintiff in fact sent such a letter, and Scanlan denies that she received it. Plaintiff in any case received no response, and he therefore filed a complaint with the Kansas Human Rights Commission on May 12, 1994, alleging that he was denied a wage increase on March 21, 1994 and a promotion on April 10, 1994 because of his disability and national origin.

Plaintiff also sent letters dated May 20, 1994, to Boeing's EEO offices in Wichita and Seattle.

On October 6, 1995, plaintiff filed a charge of retaliation with the Kansas Human Rights Commission, alleging that:

A. From December 23, 1994, to on or about March, 15, 1995, I was informed by Bob Ream in the personnel department, that I would have to work in the drafting department for three to six months. I was not allowed to go back to the engineering department. To the best of my knowledge, employees who have not filed a complaint were not forced to move out of their current department and work in another department.

B. On or about April 12, 1995, my supervisor requested my reassignment to an appropriate job commensurate with my education and experience. However, my request was denied. To the best of my knowledge, employees who have not filed a complaint were not denied reassignment.

Plaintiff filed the instant lawsuit on March 29, 1996.

## STATEMENT OF ISSUES PRESENTED

Boeing claims that it is entitled to summary judgment on the following issues:

1. Whether plaintiff's claim under 42 U.S.C. § 1981 is barred by the statute of limitations or because plaintiff fails to present a genuine issue of material fact as to each element of that claim.

2. Whether plaintiff's Title VII national origin discrimination claim is barred by plaintiff's failure to exhaust administrative remedies or his inability to present a genuine

issue of material fact as to each element of that claim.

3. Whether plaintiff's disability discrimination claim is barred by his failure to exhaust administrative remedies or his inability to present a genuine issue of material fact as to each element of that claim.

4. Whether plaintiff's Title VII retaliation claim is barred by his failure to exhaust administrative remedies or his inability to present a genuine issue of material fact as to each element of that claim.

## ANALYSIS

### I. PLAINTIFF'S CLAIM OF NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

#### A. Statute Of Limitations

 The statute of limitations for an action under 42 U.S.C. § 1981 is two years. *Garcia v. University of Kansas,* 702 F.2d 849, 851 (10th Cir.1983). Defendant claims that because plaintiff filed suit on March 29, 1996, only those claims which accrued on or after March 29, 1994 are actionable. Plaintiff disagrees, arguing without pertinent authority that the statute of limitations under Section 1981 is tolled under a "continuing violation" theory. Plaintiff claims that under this theory he is entitled to relief under Section 1981 not only for his alleged "demotion" in December of 1994 and the low performance ranking in 1995, but also for his failure to receive appropriate evaluations, raises and promotions from the beginning of 1991 through March of 1994. The Court disagrees.

 Plaintiff may not use the continuing violation theory to challenge discrete actions that occurred outside the limitations period even though the impact of the acts continues to be felt. *Pike v. City of Mission, Kansas,*

731 F.2d 655, 660 (10th Cir.1984). Each of the discriminatory acts alleged in this case was a discrete act, and any cause of action on account thereof arose when the act occurred and was communicated to plaintiff. *Ulibarri v. Lopez,* 99 F.3d 1151, 1996 WL 594281, *2 (10th Cir.1996), citing *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). The continuing violation theory is premised upon the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated. *See Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1415 at n. 6 (10th Cir.1993). Even if the doctrine—which developed under Title VII and analogous discrimination statutes—applied in this case, plaintiff cannot rely on it to overcome the statute of limitations. He clearly would have been contemporaneously aware, as events unfolded, that the foregoing acts of discrimination had occurred and that his rights had been thereby violated. As a matter of law, all of his Section 1981 claims which accrued before March 29, 1994 are therefore barred.

Plaintiff's surviving claims are his claims that Boeing discriminated against him on account of his national origin in (1) demoting him to drafter in December of 1994; and (2) ranking him 23 out of 25 engineers on the "A" totem of DS4 engineers in the performance exercise for March, 1995.[36] *Pretrial Order* (Doc. # 49) filed October 29, 1996, at 3, 6. Plaintiff claims that such conduct reflects Boeing's discriminatory intent to ensure that he could not receive work or salary increases commensurate with his performance, training, education and skill, all on account of his national origin.

#### B. Plaintiff's § 1981 National Origin Claims

As noted above, for the period beginning March 29, 1994 and thereafter, plaintiff

---

**36.** Two other events are arguably within the limitations period: (1) plaintiff's claim that he received a retention rating of 4 (the lowest rating); and (2) plaintiff's claim that Boeing refused to give him promotions and raises for earning advanced degrees. Plaintiff has not demonstrated a genuine issue of material fact whether these claims accrued on or after March 29, 1994. Plaintiff claims that he first learned of the low

retention rating in March of 1995, but the record does not reveal more precisely *when* he received the news. Nor does the record reveal that plaintiff has been laid off or otherwise adversely affected by the low retention rating. Also, plaintiff earned his advanced degrees in 1989 and 1992, and any claim for failure to advance, based on those degrees, accrued well before March of 1994.

claims that Boeing discriminated against him on account of his national origin in (1) demoting him to drafter in December of 1994; and (2) ranking him 23 out of 25 engineers on the "A" totem of DS4 engineers in the performance exercise for March, 1995.[37] Plaintiff claims that such conduct reflects Boeing's discriminatory intent on account of his national origin.

### 1. Demotion

■ Plaintiff complains that Boeing "demoted" him in December of 1994. The undisputed facts are that Boeing created a job especially to meet plaintiff's medical restrictions when he returned from his first medical leave of leave of absence on October 29, 1993; that plaintiff went on a second medical leave of absence from July 1 to December 22, 1994; and that in the meantime, the work assigned to the position created especially for plaintiff had been accomplished. The record also establishes that plaintiff was "very anxious" to get back to work and that Boeing assigned him to drafting work in Tiffany's group (with no loss of grade or salary) because of concerns that plaintiff's cognitive ability had been impaired in his accident and because that job opening "materialized the quickest." Because plaintiff was not in an existing position at the time of the alleged discrimination, however, his "demotion" claim is actually more analogous to one for discriminatory refusal to hire.

In the context of employment discrimination cases analyzed pursuant to the *McDonnell Douglas* framework, plaintiff must first establish a prima facie case of discrimination. Generally, this framework requires that plaintiff prove that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for an available position; (3) the plaintiff was rejected despite being qualified; and (4) the position remained open as the employer continued to search for applications or the position was filled by a person not within the protected class. Once plaintiff establishes a prima facie case, the employer must offer a facially nondiscriminatory rea-

son for its employment decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316–19 (10th Cir.1992). At the summary judgment stage, it then becomes plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—*i.e.* unworthy of belief. *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995); *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir.1994). If plaintiff succeeds in showing a prima facie case and presents evidence that defendant's proffered reason for the employment decision was unworthy of belief, plaintiff can withstand a summary judgment motion and is entitled to go to trial. *Id.*

Plaintiff fails to make a prima facie case under this test. First, plaintiff has not demonstrated that any more appropriate positions were available when he returned to work on December 22, 1994. He cites no evidence that the position with Nunemaker either remained open or was filled by someone outside a protected class. Plaintiff claims that Tiffany had two senior engineering positions available within his group, but he has introduced no evidence that either of them was vacant on December 22, 1994, that either position was consistent with his medical restrictions, or that either position was filled by someone outside a protected class.

For these reasons, plaintiff has not established a prima facie case of national origin discrimination based upon his job assignment when he returned from his medical leave of absence on December 22, 1994.

### 2. Plaintiff's ranking of 23 out of 25 engineers on the "A" totem in March, 1995

■ By the time of the performance rankings in March, 1995, plaintiff was assigned to Randy Henley in a liaison engineering group. Henley perceived that plaintiff needed to im-

---

**37.** On the "B" totem for the performance exercise ending March 2, 1995, plaintiff ranked 169 out of 203 engineers. Plaintiff does not challenge this ranking, but only the fact that of the 25 engineers in his salary grade who were ranked on the "B" totem of 203 engineers, he ranked 23 out of 25.

prove his communication skills, and said that plaintiff sometimes got things "muddled." He also noted that plaintiff had friction with other organizations with whom he had to interface in performance of his liaison duties. Plaintiff's 1995 ranking on the "B" totem was 169 of 203 engineers, a position a little higher than in previous years, but still well below the median. On the "A" totem, plaintiff ranked 23 out of 25 engineers in his salary grade.

Boeing claims that the issue concerning plaintiff's national origin discrimination claim is not whether plaintiff was compensated in the way he deserved to be, or even in the way others thought he deserved to be, but whether Boeing compensated him in a way that was different than those who performed as he did, but who were not Lebanese. Boeing claims that in order to meet this burden, plaintiff must prove that his performance was better than *each* of those engineers ranked above him *and that the rank assigned him was because he was Lebanese*, citing *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992), and *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1456 (10th Cir.1994). Boeing alleges that plaintiff "simply does not have the evidence to do this" and that summary judgment must therefore be granted.

Plaintiff's precise claim is that his performance rating in 1995 did not "accurately reflect the plaintiff's performance and/or value to the defendant relative to similarly situated DS-4 engineers," and that as a result, plaintiff did not receive a salary raise commensurate with his performance, training, education and skill. This claim is difficult to address because (1) the Court has no idea how Boeing's engineering workforce was demographically constituted during the relevant time period;[38] (2) the Court has no information about how promotions, raises and performance evaluation results are distributed along lines related to sex, race, national origin, etc., either within plaintiff's

work groups or among larger workplace units; and (3) the Court has no way of comparing plaintiff's performance relative to engineers above and below him on either the "A" or "B" totem because plaintiff has not favored us with any information concerning the performance, training, education or skill of other engineers. In other words, plaintiff does not claim that his work is more valuable to Boeing that the work of any identified engineer rated above him, or that any identified engineer is unqualified for the ranking which he or she received in 1995. In short, while plaintiff attacks "the manner in which he has been compensated and promoted relative to similarly situated DS-4 engineers," we do not know which engineers—according to plaintiff—are "similarly situated."[39]

Under the *McDonnell Douglas* framework, plaintiff must establish a prima facie case of discrimination. Generally, in this context, this framework requires that plaintiff prove that: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for a certain performance ranking or raise; (3) plaintiff did not receive the rankings and raises for which he was qualified; and (4) plaintiff was treated less favorably than similarly situated persons outside the protected class. On this record, plaintiff has not discharged that burden. Plaintiff's failure to specifically identify any members of the so-called "similarly situated group" of DS4 engineers is fatal to his case. Without such information, either statistically or in another form, the Court is confronted with plaintiff's naked complaint, based on his purely personal opinion, that but for his national origin, Boeing would have more richly rewarded him.

■ The Court recognizes that in order to make a prima facie case, plaintiff need not prove that he was entitled to be placed at the very top of Boeing's list, *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 347 (10th Cir. 1975), and that because Boeing's evaluation process was largely subjective, it "would have the burden of establishing the fundamental fairness" of its process, *Id.* at 348.

---

38. For all that the record shows, 100% of Boeing's engineers are of Lebanese national origin.

39. Plaintiff claims that "[s]imilarly situated engineers are those who had about the same number of years of experience and training and had worked in similar jobs as the plaintiff." *Pretrial*

*Order* (Doc. # 49) filed October 29, 1996, at 4. Who these engineers might be is undisclosed on this record. We have no idea concerning their number or their national origin, race, age, experience, training, etc.

In this case, however, the record reveals no issue of triable fact whether plaintiff's ranking was incorrect relative to any other engineer, or whether Boeing's evaluation process was fundamentally unfair.[40] Moreover, even if we accept plaintiff's claim that he has "always performed in a satisfactory manner for defendant," he does not thereby establish a prima facie case of discrimination. Boeing did not award raises to unsatisfactory employees; its task in allocating salary increases under the performance evaluation scheme was to differentiate *among* satisfactory employees—distinguishing those who were "superior" or "good" from those who were merely "satisfactory" and rewarding them accordingly. Nothing in this record suggests a triable issue of fact whether Boeing under-compensated or under-evaluated plaintiff's performance in March of 1995, relative to similarly situated engineers, on account of his national origin. "The law does not require, nor could it ever realistically require, employers to treat all of their employees all of the time in all matters with absolute, antiseptic, hindsight equality." *EEOC v. Flasher Co., Inc.*, 986 F.2d at 1319. Only distinctions based on an employee's "protected class characteristic" are actionable. *Id.* Plaintiff has not established evidence which raises an inference of illegal intent and Boeing is therefore entitled to summary judgment on plaintiff's claims under Section 1981.

## II. PLAINTIFF'S ADA AND TITLE VII DISCRIMINATION CLAIMS

### A. Exhaustion

■ On May 12, 1994, plaintiff filed a charge of discrimination with the Kansas Human Rights Commission, alleging that Boeing denied him a wage increase on March 21, 1994, and a promotion on April 10, 1994, on account of his disability (a head injury which substantially limited his memory and altered his vision) and his national origin. Boeing claims that plaintiff failed to exhaust his administrative remedies for disability or national origin discrimination except as set forth in this charge of discrimination, and seeks summary judgment on plaintiff's remaining disability and national origin discrimination claims under the ADA and Title VII, respectively.[41]

Plaintiff wants to expand the scope of the 1994 charge—insofar as it respects his ADA claim only—to include a complaint concerning Boeing's administration of its medical leave policies and his "demotion" which occurred seven and one-half months later, on December 22, 1994.[42] Specifically, plaintiff claims that Boeing subjected him to discrimination on account of physical impairments which he sustained in his injury in April, 1993, in violation of the ADA, in that Boeing (1) refused to reasonably accommodate his need for leave, so that he could meet with his physicians and continue rehabilitation; and (2) refused to reasonably accommodate his request to be returned to work in Nunemaker's group, when he returned from his second leave of absence. Plaintiff claims that these claims are "like or reasonable related to" those asserted in his charge of discrimination filed in May, 1994.

In seeking to avoid summary judgment on this issue, plaintiff cites no record evidence

---

**40.** While plaintiff complains that the process lacked written guidelines prior to 1994, he does not attack the fundamental fairness of the evaluation process, either generally or as Boeing implemented it in 1995.

**41.** On October 6, 1995, plaintiff filed a second charge of discrimination, alleging retaliation. Specifically, he complained that on December 23, 1994, continuing through March 15, 1995, Boeing told him that he would have to work in the drafting department for three to six months, and excluded him from the engineering department. He also charged that on April 12, 1995, his supervisor requested that he be reassigned to a job commensurate with his education and experience, but that Boeing denied the request.

Plaintiff claimed that in both respects, Boeing was retaliating for the fact that he had previously filed a complaint of discrimination. He did not claim that in either respect, Boeing was discriminating against him on the basis of disability or national origin.

**42.** Plaintiff does not argue that his Title VII national origin claim should be expanded beyond that stated in the administrative charge. The Court has determined that plaintiff has not stated a prima facie case of national origin discrimination under 42 U.S.C. § 1981, with respect to the so-called "demotion." For the reasons stated in that regard, any effort to bring plaintiff's demotion claim within the scope of his Title VII claim would be unavailing.

that Boeing administered it medical leave policies in a manner which violated the ADA. Therefore plaintiff has not demonstrated any issue of triable fact on that issue and whether such claims are within the scope of his administrative charge is an issue of no consequence. We therefore limit our inquiry to the question whether plaintiff should be deemed to have exhausted his administrative remedies as to his claim that Boeing demoted him in December of 1994, on account of his disability.

■ To bring a cause of action under the ADA, an employee must file a discrimination charge with the state agency within 300 days after the alleged discriminatory act occurred. 42 U.S.C. § 2000e–5(e). An aggrieved employee may not maintain a suit in federal court unless the employee has "pursued [these] avenues of potential administrative relief." *Love v. Pullman Co.,* 404 U.S. 522, 523, 92 S.Ct. 616, 617, 30 L.Ed.2d 679 (1972). An exception to the administrative exhaustion rule is "that acts committed pursuant to a pattern of discrimination challenged in an [Equal Employment Opportunity Commission] complaint, but occurring after its filing, [if] reasonably related to that complaint, ... may be challenged in district court without filing another [Equal Employment Opportunity Commission] complaint." *Brown v. Hartshorne Public School Dist. No. 1,* 864 F.2d 680, 682 (10th Cir.1988); *Archuleta v. Colorado Dept. of Institutions,* 936 F.2d 483, 488 (10th Cir.1991).

In this case, the Court finds that Boeing's decision to "demote" plaintiff in December of 1994 was not "reasonably related to" the acts of discrimination alleged in plaintiff's administrative complaint filed on May 12, 1994. In part, the administrative charge related to the fact that on March 21, 1994, Boeing had denied plaintiff a wage increase, allegedly on account of his disability. Of course the un-

disputed fact in this case is that under the collective bargaining agreement then in effect, plaintiff was not eligible for a raise in March of 1994 because he had been on a leave of absence for more than 90 days in the evaluation period. Whether Boeing violated plaintiff's rights under the ADA, in applying this policy, is an issue very distinctly separate and apart from any claim that Boeing "demoted" plaintiff eight months later, on December 22, 1994.[43] The Court therefore agrees with Boeing that plaintiff failed to exhaust his administrative remedies with respect to his claim that Boeing "demoted" him in December, 1994, in violation of the ADA, on account of his disability.

### B. Plaintiff's Title VII National Origin Claim

In the pretrial order, plaintiff does not distinguish the national origin claims which he brings under 42 U.S.C. § 1981 from those which he brings under Title VII. Plaintiff has exhausted his administrative remedies only as to two claims, however, and he does not argue that the administrative charge which he filed on May 12, 1994 should be broadly construed to include other claims. We therefore consider only the two claims advanced in the administrative charge. We mention them only briefly, for they are fatally flawed from the outset.

Plaintiff's first claim is that on account of his national origin, Boeing denied plaintiff a wage increase on March 21, 1994, although others in his position with less education and experience were being paid more than he was. Again, the undisputed fact in this case is that plaintiff was not eligible for a raise in 1994 because he had been on a leave of absence for more than 90 days in the evaluation period, and the collective bargaining agreement rendered him ineligible to participate in the performance evaluation process.[44] More importantly, plaintiff does not advance

---

**43.** The administrative charge also complains that Boeing discriminated against him on the basis of disability by refusing to promote him on April 10, 1994. The pretrial order makes no such claim and the record reveals no evidence to support it. Plaintiff does not attempt to persuade the Court that his demotion claim is reasonably related to this "failure to promote" claim, and the Court does not address it.

**44.** Plaintiff has presented no evidence from which a reasonable jury might infer that Boeing intentionally discriminated against him on account of his national origin by failing to grant him a rare out-of-sequence raise pertaining to this time period.

this claim as a basis for relief in this case. See *Pretrial Order* (Doc. # 49) filed October 29, 1996. He has apparently abandoned it and we need not consider it further.

Plaintiff's second claim is that Boeing discriminated against him on the basis of national origin by refusing to promote him on April 10, 1994. The pretrial order makes no such claim and the record reveals no evidence to support it. Again, plaintiff has apparently abandoned this claim and we need not consider it further.

### C. Plaintiff's Disability Discrimination Claim

Plaintiff has exhausted his administrative remedies as to only two claims for disability discrimination. We therefore consider only those claims advanced in the administrative charge. We mention them only briefly, for like those advanced above with respect to plaintiff's national origin claims, they are fatally flawed from the outset.

Plaintiff's first claim is that on account of his disability, Boeing denied plaintiff a wage increase on March 21, 1994, although others in his position with less education and experience were being paid more than he was. Again, the undisputed fact in this case is that plaintiff was not eligible for a raise in 1994 because he had been on a leave of absence for more than 90 days in the evaluation period, and the collective bargaining agreement rendered him ineligible to participate in the performance evaluation process.[45] More importantly, plaintiff does not advance this claim as a basis for relief in this case. See *Pretrial Order* (Doc. # 49) filed October 29, 1996. He has apparently abandoned it and we need not consider it further.

Plaintiff's second claim is that Boeing discriminated against him on the basis of disability by refusing to promote him on April 10, 1994. The pretrial order makes no such claim, however, and the record reveals no evidence to support it. Again, plaintiff has apparently abandoned this claim and we need not consider it further.

In opposing defendant's motion for summary judgment, plaintiff speaks only of the fact that Boeing "demoted" him on account of his disability. That claim, for reasons previously stated, is not properly before us.[46]

### III. PLAINTIFF'S RETALIATION CLAIMS

#### A. Exhaustion of Administrative Remedies

On October 6, 1995, plaintiff filed a second charge of discrimination, alleging retaliation. Specifically, he complained that on December 23, 1994, continuing through March 15, 1995, Boeing told him that he would have to work in the drafting department for three to six months, and excluded him from the engineering department. He also charged that on April 12, 1995, his supervisor requested that he be reassigned to a job commensurate with his education and experience, but that Boeing denied the request. Plaintiff claimed that in both respects, Boeing was retaliating for the fact that he had previously filed a complaint of discrimination. He did not

---

**45.** Plaintiff has presented no evidence from which a reasonable jury might infer that Boeing intentionally discriminated against him on account of his disability by failing to grant him a rare out-of-sequence raise pertaining to this time period.

**46.** On the merits, plaintiff's claim would also fail. To assert a prima facie case of disability discrimination, plaintiff must demonstrate: (1) that he is disabled; (2) that he could perform the essential functions of his job, with or without reasonable accommodation (which he must identify); and (3) that the employment action amounts to unlawful discrimination because of his disability. *White v. York Int'l Corp.,* 45 F.3d 357, 360–61 (10th Cir.1995). Plaintiff's disability discrimination claim fails because he has not demonstrated

that he can perform the essential functions of the jobs which he seeks, with or without reasonable accommodation (which he must identify). Plaintiff has not demonstrated a triable issue with respect to the fact that engineering jobs in Nunemaker's group require the use of a computer 80% of the time, and he has not demonstrated that he can perform (or could perform) the essential functions of any engineering job (other than the one he now holds), either with or without accommodation. Nor has he shown that intensive computer use was something other than a bona fide occupational requirement at the time he returned to work on December 22, 1994. Therefore plaintiff cannot establish a prima facie case of disability discrimination concerning his job assignment at that time.

claim that in either respect, Boeing was discriminating against him on the basis of disability or national origin. Boeing claims that plaintiff has failed to exhaust his administrative remedies on any issues other than retaliation, and seeks summary judgment to that effect. *See Franklin v. New Coleman Holdings, Inc.,* 1993 WL 453678 at *8–9 (D.Kan. 1993), *aff'd,* 39 F.3d 1191 (1994).

Plaintiff apparently believes that the scope of the administrative charge should be expanded, because in his opposition to defendant's motion for summary judgment, he argues that his claim "that the December 1993 to July 1994 Performance Review is retaliatory must survive the defendant's motion for summary judgment." For purposes of this motion, the Court assumes that this claim of retaliation is reasonably related to the retaliation claims advanced in plaintiff's administrative charge, and address it on the merits.

**B. Plaintiff's Retaliation Claim**

For purposes of this motion, the Court construes plaintiff's retaliation claim to be that because he filed a charge of discrimination on May 12, 1994: (1) Boeing "demoted" plaintiff to a drafting position and excluded him from his prior engineering job beginning December 22, 1994; (2) on January 9, 1995, Boeing gave him an unfair performance review for the period from December, 1993 to July, 1994; and (3) Boeing ranked plaintiff in the lower 25th percentile on the totems generated in March of 1995 and March of 1996.[47]

■■■ To state a prima facie case of Title VII retaliation, plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) that an adverse employment action occurred subsequent to or contemporaneous with that activity; and (3) that there is a causal connection between the protected activity and the adverse employment action. *See Conner v. Schnuck Markets, Inc.,* 906 F.Supp. 606, 611 (D.Kan.1995), and cases cited therein. If plaintiff does so, defendant is then obligated to explain a legitimate reason for the employment action taken. Once an

acceptable explanation is given, plaintiff must offer some evidence that this reason is merely a pretext for discrimination or he will not survive summary judgment. *Id.* at 613. Conclusory allegations will not prevent the court from granting summary judgment. *Id.* at 614.

**1. Demotion and Reassignment on December 22, 1994**

■■■ Plaintiff claims that Boeing changed his job duties from engineering to drafting in late December, 1994, because had he filed a KHRC complaint in May, 1994. Boeing claims that it is entitled to summary judgment on this claim because plaintiff cannot prove a link between his transfer and his protected activity. Plaintiff argues that Susan Amos sent an e-mail to Bob Ream, Boeing's human resources manager, notifying him that plaintiff had filed a charge of discrimination; that on May 24, 1994, Boeing distributed a memo warning managers *not* to retaliate against plaintiff; and that "immediately" thereafter, Ream decided that plaintiff could not return to his position in Nunemaker's group. This argument falls of its own weight for several reasons. First, and most importantly, no such evidence has been presented in compliance with D.Kan.Rule 56.1 or the scheduling order in this case. Bob Ream's name appears nowhere in the facts which the Court has found to be undisputed. Moreover, even according to the deposition testimony cited by plaintiff, Ream did not receive the e-mail from Amos until *1996*—as much as two years after he allegedly exiled plaintiff from the engineering department. Indeed, the record suggests that Prohaska, Tiffany, and plaintiff himself—and not Ream—decided to reassign plaintiff. Plaintiff has not through record evidence demonstrated a triable issue of fact (1) that Ream knew about plaintiff's protected activity in December, 1994; or (2) that Ream even made a decision to exile plaintiff from the engineering department. Without such proof, a jury could not reasonably infer that

---

**47.** The administrative charge also complains that on April 12, 1995, plaintiff's supervisor requested that he be reassigned to a job commensurate with his education and experience, but that Boeing denied the request. Plaintiff makes no such claim in this suit, and he has apparently abandoned it.

even under plaintiff's theory on this claim, Boeing had a retaliatory motive in not allowing plaintiff to return to Nunemaker's group.

Plaintiff also claims that "immediately" after Boeing distributed the May 24, 1994 memo warning managers not to retaliate against plaintiff, Tiffany demoted him to the position of drafter.[48] Again, however, the record reveals no evidence that Tiffany knew about plaintiff's protected activity when he assigned plaintiff drafting duties in December, 1994. Again, without such proof, a jury could not reasonably infer that Tiffany entertained a retaliatory motive in formulating plaintiff's job assignments.

### 2. January, 1995 Performance Review

█ Plaintiff claims that on January 9, 1995, Nunemaker signed an adverse performance review for the period from December, 1993 to July, 1994. As evidence of its retaliatory purpose, plaintiff contends that it occurred shortly after interviews by Mark Mason (the Court has no idea what this reference concerns; the record evidence make no reference to any such interviews) and circulation of the May 24, 1994 memo warning managers not to retaliate against plaintiff. Plaintiff argues that "Nunemaker was part of management and would under normal circumstances" have been informed that plaintiff had filed a charge of discrimination in May of 1994. Plaintiff cites no evidence concerning what Boeing's "normal" communication channels were, however, and the record is devoid of evidence that Nunemaker had actual knowledge of any protected activity by plaintiff. Without that crucial proof, plaintiff cannot establish a fact question about whether Nunemaker's assessment of plaintiff and plaintiff's protected activity are related.

### 3. 1995 and 1996 Totem Rankings

█ Plaintiff claims that the totem ranking which he received on March 2, 1995 and the totem ranking which he received on March 2, 1996, were retaliatory because they

occurred after he filed his complaint of discrimination on May 12, 1994.

Boeing argues that Henley participated in the totem exercises for both 1995 and 1996; that the record contains no evidence that Henley knew of plaintiff's administrative complaint when he participated in those exercises; and that without such evidence, plaintiff cannot establish a prima facie case of retaliation. Plaintiff does not dispute this point and the Court finds that Boeing is entitled to summary judgment on this point.

### CONCLUSION

For all of the foregoing reasons, Boeing has demonstrated that it is entitled to summary judgment in this case. On these facts, a jury could not reasonably resolve any of plaintiff's claims in his favor.

**IT IS THEREFORE ORDERED** that *Defendant's Motion For Summary Judgment* (Doc. # 58) filed November 8, 1996, be and hereby is sustained.

---

48. From the argument it is not clear whether plaintiff has a prolonged sense of "immediacy" or whether he claims that Ream and Tiffany "immediately" formed an intent to retaliate (in late May, 1994) but not to "immediately" act on it.