**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 14 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

JOSEPH P. AMRO,

        Plaintiff - Appellant,

    v.

THE BOEING COMPANY,

        Defendant - Appellee.

No. 99-3281

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS
### (D.C. NO. CV-98-2257-KHV)

Albert F. Kuhl, Law Offices of Albert F. Kuhl, Lenexa, Kansas (Bobbie R. Bailey, The Bailey Law Firm, Kansas City, Missouri, with him on the briefs), for Appellant.

Timothy B. Mustaine, Foulston & Siefkin, L.L.P., Wichita, Kansas, for Appellee.

Before **KELLY**, **ANDERSON**, and **HENRY**, Circuit Judges.

**ANDERSON**, Circuit Judge.

Joseph Amro, who is of Lebanese ancestry, brought this action against his

employer, The Boeing Company, alleging discrimination and retaliation in

violation of Title VII and 42 U.S.C. § 1981 in connection with the denial of various employment opportunities. The district court granted summary judgment to Boeing. Mr. Amro appeals and we affirm.

## BACKGROUND

Mr. Amro, who is an engineer, was hired by Boeing in 1984. By 1999, he was a senior engineer, Grade 12, DS-4 Skill Code. In April 1993, Mr. Amro was seriously injured in a workplace accident which left him with various physical impairments, including vision problems which made it difficult for him to focus on the CATIA computer screen he used on the job. [1] The accident resulted in various permanent medical restrictions on his work environment.

In March 1996, Mr. Amro sued Boeing, alleging that Boeing had discriminated against him for years because of his Lebanese ancestry, race, color and disability. The district court granted summary judgment to Boeing, and this court affirmed. Amro v. Boeing Co., 951 F. Supp. 1533 (D. Kan. 1997), aff'd, No. 97-3049, 1998 WL 380510 (10th Cir. July 8, 1998) (unpublished) (Amro I). Of particular relevance to this action, the district court in Amro I held that Mr. Amro failed to establish a prima facie case of discrimination with respect to Mr.

---

[1]CATIA stands for "computer-aided three-dimensional interactive application." It is a proprietary computer software program.

Amro's ranking among his fellow engineers. The present lawsuit involves incidents occurring after March 1996.

## I. Boeing's salary adjustment process

Since 1989, professional engineers at the Boeing Wichita plant where Mr. Amro worked have been subject to a series of collective bargaining agreements. The Collective Bargaining Agreement ("CBA") in effect at the time relevant to this lawsuit was between Boeing and the Seattle Professional Engineering Employees' Association ("SPEEA"). The district court described its operation as follows:

> It provides that on an annual basis, Boeing will selectively increase the salaries of eligible employees in the bargaining unit. For each year's salary exercise, Boeing establishes a fund by multiplying the sum of the eligible employees' salaries by a percentage set forth in the CBA. The CBA set those percentages at 4.0 percent for 1997, 4.5 percent for 1998, and 5.0 percent for 1999.

Amro v. Boeing Co., 65 F. Supp. 2d 1170, 1178 (D. Kan. 1999). Boeing determined which individual engineers received raises and determined the amount of those raises. The district court described that process as follows:

> Eligibility depends on the employee's placement on Boeing's final salary totems. Salary totems are compiled through the salary adjustment process, numerous meetings of working level supervisors and managers, and meetings of the larger totem committee. As part of the process Boeing breaks the large group of DS-4 engineers into smaller "peer" groups which are composed of engineers who have similar experiences, acquired skills, capabilities and B.S. Equivalent

years.  B.S. Equivalent years are generally defined as the number of years of engineering-related experience which the employee has acquired since receiving a B.S. degree.

Id.  Within each particular peer group, Boeing compared engineers using five criteria:  accumulation of responsibility; accumulation of skills; leadership; quality and quantity of work; and attitude.

The salary exercise would begin with working-level meetings among the immediate supervisors of a particular group of engineers.  The supervisors used the five stated criteria to rank engineers within their peer group.  The working level group then selected a "focal" or "representative to attend totem committee meetings at which all engineers on the DS-4 totem are integrated into a single totem and ranked by relative performance."    Id. at 1179.  Through a lengthy and multi-dimensional process of meetings and discussions, "the focals and representatives reach consensus on final target salaries and actual salary increases."   Id. at 1180.  An engineer's final target salary for any given year would be the starting point for the following year's salary exercise.    See Vopat Dep. at 154, Appellee's App. at 178.

## II.  Mr. Amro's allegations

With that background in mind, we turn to the specifics of Mr. Amro's complaints about his own treatment by Boeing.  Mr. Amro alleged in district court that his annual salary adjustments in 1997, 1998 and 1999 were insufficient, that he was denied a "special skills" targeted pay raise in 1997, that he was harassed by his supervisor, and that he was denied a lateral transfer for several months.  He asserts that Boeing's actions were discriminatory and in retaliation for his prior lawsuit.  In this appeal, he has abandoned his claims based upon his 1998 and 1999 salary adjustments, and he has abandoned his claims based upon the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213.  He continues to argue, however, that he suffered discrimination in connection with his 1997 salary adjustment, that he was wrongly denied the special skills raise, that his supervisor harassed him, and that his transfer was delayed.

## III.  Mr. Amro's 1997 salary adjustment

The working-level group that first considered Mr. Amro's 1997 salary adjustment was the Wide-Body responsibility group.  Randy Henley was Mr. Amro's direct supervisor when the 1997 DS-4 salary review process commenced.  Mr. Amro and Kevin Smith, a non-minority engineer, were the only DS-4 engineers under Mr. Henley's direct supervision.  Mr. Henley evaluated the two

using the five stated criteria. Mr. Henley concluded that Mr. Smith and Mr. Amro were equivalent in accumulation of skills and in attitude. He ranked Mr. Smith higher in leadership and accumulation of responsibility. Mr. Henley testified that Mr. Amro put out a lot of work and that his work quality was good, with probably no more returns than Mr. Smith. "Based on the five criteria, Henley judged Smith a better performer because he had lead responsibilities and more duties than [Mr. Amro]." Amro, 65 F. Supp. 2d at 1180.

The result of the 1997 salary exercise was a $1700 raise for Mr. Amro, which amounted to a 4.2% increase, slightly higher than the 4.0% required by the CBA to be devoted to raises. Of the 303 DS-4 engineers at Boeing's Wichita plant in October 1997, 92%, including Kevin Smith, received salary increases greater than Mr. Amro's. As the district court found:

> [t]he average salary adjustment was 10.3 percent for engineers in the targeted low experience group and 6.3 percent for the entire totem group. Henley was aware of two or three other engineers on the DS-4 totem who had the same number of experience years as [Mr. Amro]. He considered [Mr. Amro's] position at the bottom of the ranking for his peer group to be appropriate.

Id. at 1180.

### IV. Special skills targeted raise

Boeing was experiencing a high rate of attrition among its employees with what Boeing identified as special or critical skills. Other companies were luring those employees away with higher salaries. As a result, Boeing began a program of awarding targeted and annual raises to certain key individuals—engineers with eight years or less experience and engineers with certain critical skills that Boeing did not want to lose. Of the 383 engineers on the DS-4 totem on March 4, 1997, only 34 received supplemental targeted or out-of-sequence raises in 1997. Mr. Amro was not among them.

### V. Mr. Amro's harassment allegations

Mr. Amro met with Mr. Henley and Jerry Kreutzer, his second-level manager, on April 4, 1997, and told them he thought they were discriminating against him. Mr. Henley told him that his medical restrictions prevented him from progressing at Boeing. Mr. Kreutzer told Mr. Amro that his medical restrictions "were like a 'ball and chain' on [his] leg and that until [his] restrictions concerning CATIA use were removed nothing would change about [his] merit increases, [his] retention rankings or [his] B-totem ranking." Amro Aff. ¶ 31, Appellant's App. Vol. II at 167.

Mr. Amro alleges that Mr. Henley then angrily left, stating that he would not take this "shit" anymore. Amro Aff. ¶ 32, id. Mr. Kreutzer called Mr. Amro a "jackass" and told him he was lucky Boeing had a lot of work at that time. Amro Aff. ¶ 33, id. Mr. Amro further avers that, following the meeting, Mr. Henley said to him, "You fucking foreigner, you're lucky to have a job." Amro Aff. ¶ 34, id. He also alleges that Mr. Henley placed his hands on Mr. Amro's neck and patted him down, asking whether he had a tape recorder. Finally, Mr. Amro asserts that a few days after that meeting, Mr. Henley threw drawing papers at Mr. Amro, causing a paper cut on his neck.

Mr. Amro also alleges that on another occasion Mr. Henley demanded to search through a brown folder Mr. Amro was carrying, and the subsequent search was humiliating. On one other occasion, when Mr. Amro did not respond to Mr. Henley, Mr. Henley said, "Damn it. Are you deaf? Turn it up grandpa." Amro Dep. at 87, Appellee's App. at 15. On one final occasion, while Mr. Henley and Mr. Amro were on the shop floor, Mr. Henley said, "Come on with me. You're getting too old," when Mr. Amro lagged behind. Amro Dep. at 92, id. at 17.

## VI. Mr. Amro's transfer allegations

Mr. Amro was notified on March 19, 1997, that his ranking on the B-Totem was 313 out of 383 engineers. At the April 4, 1997, meeting with Mr. Henley and

Mr. Kreutzer, Mr. Amro expressed his unhappiness with his ranking and his raise. As indicated above, Mr. Henley and Mr. Kreutzer told Mr. Amro that his medical restrictions were impeding his progress at Boeing. Mr. Amro then agreed to tell Mr. Henley and Mr. Kreutzer if he found a position to which he wanted to transfer.

On April 14, 1997, Mr. Amro filed a grievance with the SPEEA concerning the April 4 meeting, as well as the other encounters and incidents of alleged harassment. Mr. Amro alleged that he was "not receiving fair consideration for merit increases, B-totems and retention levels." Amro Dep. at 87, id. at 15. There was a grievance meeting, followed by Boeing's formal response to the grievance. No further union activity relating to the grievance occurred.

Mr. Amro alleges that he was not told until May 1997 that he needed to fill out a Career Transfer Request before any transfer would be considered. In June 1997, he obtained a modification of his medical restrictions so that he had no restrictions on his use of graphical computer systems, and his only restriction on other computer use was that the screen had to be 17 inches or larger with a zoom capability. Mr. Amro argues that, despite his completion of a Career Transfer Request, he was not transferred to various positions for which he was qualified and which were available, and he was, in general, given the "run around" for several months. In October 1997, he was notified that he would be transferred

into a new position, which he assumed in November 1997. He has continued to work there without complaint. Mr. Amro argues the delay in completing that transfer was deliberate and discriminatory.

## DISCUSSION

We review the grant of summary judgment de novo, applying the same standard as did the district court. See Thomas v. National Assoc. of Letter Carriers , 225 F.3d 1149, 1154 (10th Cir. 2000). Accordingly, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In reviewing the appeal from the grant of summary judgment against [Mr. Amro], we accept the version of the facts most favorable to [Mr. Amro], the non-moving party." Thomas , 225 F.3d at 1152 n.1. Further, we may affirm the district court for any reason supported by the record. See Perry v. Woodward , 199 F.3d 1126, 1141 n.13 (10th Cir. 1999), cert. denied , 120 S. Ct. 1964 (2000).

"A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination . . . or indirect (i.e., circumstantial) evidence of discrimination." Kendrick v. Penske

Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000). McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) provides the framework for analyzing circumstantial evidence under either § 1981 or Title VII. See Perry, 199 F.3d at 1135. Thus, under McDonnell Douglas, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." McDonnell Douglas, 411 U.S. at 802.

The district court granted summary judgment to Boeing on Mr. Amro's transfer claim with the following explanation of why Mr. Amro failed to establish a prima facie case:

> Plaintiff has identified several available positions for which he was allegedly qualified and to which he was not hired in the summer of 1997. Except to show that none of those hired were Lebanese, however, plaintiff has failed to present any evidence regarding the race or national origin of the successful job applicants.

Amro, 65 F. Supp. 2d at 1185-86. The district court so held in reliance upon our decision in Reynolds v. School Dist. 1, 69 F.3d 1523 (10th Cir. 1995), in which we stated as follows:

> To carry the initial burden of establishing a prima facie case of race discrimination for a failure to promote claim, the plaintiff must typically show that he or she (1) belongs to a minority group; (2) was qualified for the promotion; (3) was not promoted; and (4) that the position remained open or was filled with a non-minority.

Id. at 1534.

- 11 -

More recently, we have clarified the elements required to establish a prima facie case. In <u>Kendrick</u> and <u>Perry</u> we held that "the elements of a prima facie case are the same in hiring and discharge cases." <u>Kendrick</u>, 220 F.3d at 1229 (citing <u>Perry</u>). We also clarified what is required under the fourth step of the prima facie case: the plaintiff may establish the fourth element of the prima facie case by demonstrating that the position from which he or she was discharged or into which he or she was not hired was filled or remained available following the plaintiff's discharge or failure to hire. The plaintiff is not required to show that it was filled by someone outside the plaintiff's protected class. [2]

Mr. Amro argues the district court erred under <u>Perry</u> when it faulted Mr. Amro for failing to "present any evidence regarding the race or national origin of the successful job applicants [for positions to which Mr. Amro wanted to be transferred]." <u>Amro</u>, 65 F. Supp. 2d at 1186. While the district court may have misstated the fourth element of the prima facie case in a typical discharge or failure to hire case, by suggesting that Mr. Amro had to show that the positions he wanted were filled by non-Lebanese people, any such error does not necessarily

---

[2] As we recently acknowledged, "[a] plaintiff alleging discrimination in violation of Title VII can satisfy the fourth element of her prima facie case in a number of ways." <u>EEOC v. Horizons/CMS Healthcare Corp.</u>, 220 F.3d 1184, 1195 n.6 (10th Cir. 2000).

compel reversal of the district court's grant of summary judgment to Boeing. [3]

See Kendrick , 220 F.3d at 1229 (noting that although the district court erred in its articulation of the prima facie case, "[t]he district court's error was . . . harmless because Kendrick made out a prima facie case under the Perry standard.").

Mr. Amro has failed to make out a prima facie case under any articulation of the standard. Mr. Amro alleges several types of discrimination: that he was not transferred into positions he wanted quickly enough; that he was given an insufficient annual pay raise in 1997; that he was denied a special pay raise in 1997; and that he was harassed on several occasions by Mr. Henley.

---

[3]There has been some confusion in our prior cases as to the requisite elements of the fourth step of the prima facie case. See Kendrick, 220 F.3d at 1228 ("Some confusion regarding the fourth prong of the plaintiff's prima facie case in a discharge situation crept into our nomenclature in later cases where, occasionally, we would articulate the fourth prong of the prima facie case as requiring a plaintiff to show that the replacement employee was of nonprotected status.").

Moreover, the prima facie case is not a rigid and inflexible doctrine. In certain cases involving discrimination falling outside the more traditional categories of hiring and firing, it may be modified. See id. at1227 n.6 ("Collapsing the four-part prima facie case of McDonnell Douglas into a three-part test may occasionally be helpful when addressing discrimination claims that either do not fall into any of the traditional categories (e.g., hiring or discharge) or present unusual circumstances.").

## I. Transfer

If we view his transfer claim as analogous to a failure to hire claim, Mr. Amro was obligated to establish a prima facie case of discrimination by showing that (1) he belongs to a protected class; (2) he sought and was qualified for a job for which Boeing was seeking applicants; (3) despite his qualifications, he was not transferred into that position; and (4) after his rejection, the position remained open and Boeing continued to seek applicants from people of Mr. Amro's qualifications. See McDonnell Douglas, 411 U.S. at 802. Mr. Amro's prima facie case founders because he presents no evidence that there were specific jobs for which he was in fact qualified, or that Boeing transferred particular engineers with the same qualifications as Mr. Amro into positions for which he was also qualified. [4]

To the extent he argues the delay in accomplishing his transfer was actionable discrimination, his claim fails for the simple reason that he cannot demonstrate that the delay amounted to any adverse employment action by Boeing. Although Mr. Amro alleges that his transfer was delayed by several months, he did ultimately transfer to a job in which he currently apparently

---

[4]Both before the district court and this court Mr. Amro has made conclusory allegations about the existence of available jobs for which he was qualified. He failed below, and the record reveals he fails here, to present any evidence supporting those conclusory assertions.

- 14 -

performs without complaint.  He cites no case, and we are aware of none, which holds that the mere delay in obtaining a desired transfer, in the absence of some other negative or unfavorable effect from that delay, constitutes an adverse employment action.    See Galabya v. New York City Bd. of Educ.   , 202 F.3d 636, 640 (2d Cir. 2000) ("The unspecified inconvenience that appellant endured because of the relatively minor administrative miscues that occurred during the reassignment process is not cognizable as an adverse employment action.").

He identifies no such effect or consequence from the delay, other than that he continued working under Mr. Henley whom he alleges harassed him.  He relies upon those unpleasant and vulgar encounters with Mr. Henley to support his claim that he was deliberately and discriminatorily denied an earlier transfer and to establish that he experienced an adverse employment action by being forced to endure those encounters longer than he claims he should have.  Those comments and encounters cannot, however, overcome Mr. Amro's failure to establish that there were actual positions for which he was qualified and which he was denied. Nor was Mr. Henley's conduct itself sufficiently negative and pervasive to create an adverse employment action.  We agree with the district court that "such treatment without more did not materially affect the terms and conditions of [Mr.

Amro's] employment. It was not severe or pervasive enough to be an adverse employment action." Amro, 65 F. Supp. 2d at 1188. [5]

Moreover, Mr. Amro fails to demonstrate that his transfer took any longer than any other transfer at Boeing or was in any way different from other lateral transfers. In sum, Mr. Amro fails to establish a prima facie case of discrimination in connection with his transfer.

## II. 1997 pay raise

Mr. Amro also alleges his pay raise in 1997 was too low. A person alleging a Title VII wage discrimination claim must show, as part of his prima facie burden, that he was paid less, or given a lesser raise, than other similarly situated non-protected class employees. See Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1363 (10th Cir. 1997). Mr. Amro fails to do so. He asserts that his pay raise was less than the raises received by 92% of the engineers in his classification. However, he fails to demonstrate that there were in fact other similarly situated engineers outside his protected class who received higher raises. After carefully reviewing the record, we agree with the district court that

---

[5]Mr. Amro does not appear to make an independent hostile work environment claim based on Mr. Henley's conduct. Rather, he points to that conduct as supporting his claim that he experienced adverse employment action and to demonstrate Mr. Henley's discriminatory animus.

"although [Mr. Amro] has identified others who allegedly are similarly situated engineers, he has not provided any evidence of their performance, training, education or skills. [Mr. Amro's] own opinion that his performance is excellent does not raise a fact question as to how his performance compares to others." Amro, 65 F. Supp. 2d at 1186; see also Jones v. Denver Post Corp., 203 F.3d 748, 754 (10th Cir. 2000) ("'It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance.'") (quoting Furr v. Seagate Tech., Inc., 82 F.3d 980, 988 (10th Cir. 1996)). In essence, Mr. Amro alleges "[t]he simple fact that [he] did not receive as high a raise as [he] feels he is worth." Murphy v. Yellow Freight Sys., Inc., 832 F. Supp. 1543, 1550 (N.D. Ga. 1993). That is insufficient. [6] That insufficiency is not remedied by invoking Mr. Henley's comments and conduct towards Mr. Amro.

Additionally, it is clear that, in Boeing's complex salary exercise process, Mr. Amro's annual salary in prior years indirectly affected his target salary in 1997. The prior decision of our court in his earlier discrimination action established that those prior salary exercises were not discriminatory towards Mr.

---

[6]As we have acknowledged before, "Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination *based upon* an employee's protected class characteristics." EEOC v. Flasher Co. Inc., 986 F.2d 1312, 1319 (10th Cir. 1992).

Amro. Thus, Mr. Amro is unfortunately, in part, experiencing the ramifications of his prior salary exercises, about which he was unhappy but as to which he suffered no actionable discrimination.

### III. Special skills raise

Mr. Amro also alleges discrimination in connection with his failure to receive a targeted special skills raise in 1997. Only 34 of the 383 engineers on the DS-4 totem received that raise. We agree with the district court that Mr. Amro "has not produced evidence that he possessed critical skills that Boeing wanted to maintain," nor has he "produce[d] any evidence about how his skills compared to the skills of the engineers who did receive the funds." Amro, 65 F. Supp. 2d at 1186-87.

### IV. Retaliation

Mr. Amro alleges that Boeing retaliated against him for filing his law suit in 1996 and for initiating the present law suit. "A plaintiff establishes a prima facie case of retaliation by showing: (1) he or she engaged in protected opposition to discrimination; (2) he or she was subject to adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action." Kendrick, 220 F.3d at 1234. Mr. Amro concedes that the district

court correctly identified that prima facie case standard, but he argues the court erred in determining that he failed to meet it. We agree with the district court that Mr. Amro has failed to demonstrate that he experienced adverse employment action. As indicated above, his unhappiness with his evaluations and salary raise does not constitute adverse employment action given that he "has not shown that his performance merits a higher ranking." Amro, 65 F. Supp. 2d at 1187. Nor, as also indicated above, does Mr. Henley's conduct amount to such adverse employment action. We accordingly affirm the district court's conclusion that Mr. Amro failed to establish a prima facie case of retaliation.

## CONCLUSION

For the forgoing reasons, the judgment of the district court is AFFIRMED.