FILED
United States Court of Appeals
Tenth Circuit

August 28, 2012

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MAGDELENE LUCERO,

Plaintiff-Appellant,

v.

SANDIA CORPORATION, doing
business as Sandia National
Laboratories,

Defendant-Appellee.

No. 11-2028
(D.C. No. 1:09-CV-00908-JCH-WDS)
(D.N.M.)

---

ORDER AND JUDGMENT[*]

---

Before **HOLMES**, **EBEL**, and **MATHESON**, Circuit Judges.

Plaintiff-Appellant Magdelene Lucero appeals from the district court's

order granting summary judgment to Defendant-Appellee Sandia Corporation,

d/b/a Sandia National Laboratories ("Sandia"), on Ms. Lucero's age

discrimination and national-origin discrimination claims. For the following

reasons, we affirm the judgment of the district court.

---

[*]       This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Federal Rule of Appellate
Procedure 32.1 and Tenth Circuit Rule 32.1.

# I

## A

Ms. Lucero was born in 1950 and her national origin is Hispanic. After graduating from highschool, Ms. Lucero began work at Sandia as a secretarial trainee in 1968. She rose through the ranks and, in April 2000, she became a member of the technical staff in Sandia's Safeguards and Security center. Ms. Lucero is now retired from Sandia.

Ms. Lucero sued Sandia, alleging, *inter alia*, that, during certain years between September 2003 and June 2008, her performance ratings (which were one factor affecting her annual raises) were lower than the performance ratings of other similarly situated employees. She alleges that this was the result of discrimination based on her age and national origin by her immediate manager at the time, Joe Sandoval. Mr. Sandoval is half Hispanic and half German.

To determine individual raises, Sandia uses a computer program that takes into account many factors, including each employee's performance rating, each employee's pre-raise salary compared to the salaries of her peers, and the total pool of money that Sandia will allot to employee raises for a particular year. At Sandia, the performance rating is called the Value of Contribution ("VOC") rating. There are only five possible VOC ratings. The current ratings are "Outstanding Contributor," "Full Contributor–High," "Full Contributor–Meets Expectations," "Full Contributor–Low," and "Not Fully Contributing." J.A., Vol.

I, at 273 (Dist. Ct. Mem. Op. & Order, filed Jan. 3, 2011) (capitalization altered). Before 2006, the categories were "Outstanding Contribution," "Full Contribution," and "Not Fully Contributing." *Id.* at 273 n.1 (capitalization altered).

Managers determine employee VOC ratings. In doing so, they are constrained by the need to adhere to a curve. For each rating, a manager must follow certain guidelines that define the acceptable percentage of his or her employees that may receive that rating. For example, a manager may award no more than twenty-five percent of her employees a rating of "Outstanding Contributor," and that ratio must be rounded down (in other words, "whether a manager oversees four or seven employees, he may award only one 'outstanding contributor' rating in a given year"). *Id.* at 273.

The VOC is the only input into the computer program that an employee's direct supervisor controls, and it is the only input that Ms. Lucero claims is the product of discrimination, i.e., Ms. Lucero does not allege that any other factor influencing her raise was the product of discrimination, or that Sandia's computer program, used to convert all of the inputs into a raise amount, is itself discriminatory. "At no point did [Mr.] Sandoval or any other individual manager decide the amount of [Ms.] Lucero's raise." *Id.* at 274.

As Ms. Lucero's immediate manager from September 2003 through June 2008; however, Mr. Sandoval assigned Ms. Lucero VOC ratings for 2004, 2005,

2006 and 2007. In 2004, he gave her an "Outstanding Contributor" rating and for the remaining three years gave her some form of "Full Contributor" rating. Nonetheless, Ms. Lucero alleges that Mr. Sandoval discriminated against her in making these VOC assignments and that it had an adverse effect on her employment. Because of the allegedly discriminatory assignments, Ms. Lucero contends that she received smaller raises. And because she received smaller raises, according to Ms. Lucero, she was barred from being promoted for three years, from 2006 through 2008, due to Sandia's polices, which tied promotion eligibility to a comparative wage assessment—that is, to a determination of how an employee's salary measured up (by certain percentages) to the average wage of other Sandia employees in her peer group.

**B**

On October 9, 2008, Ms. Lucero filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of her age and national origin.[1] The EEOC mailed a Notice of Right to Sue to Ms.

---

[1] Significantly, in initiating her lawsuit, Ms. Lucero described in her filings the substance of the EEOC charge. Ms. Lucero filed, but did not immediately serve, her original complaint. Rather, "she exercised her right to amend her complaint without leave of court by filing her First Amended Complaint." Dist. Ct. Doc. No. 77, at 2 (Mem. Op. & Order, filed Aug. 5, 2010); *see* Fed. R. Civ. P. 15(a)(1) (discussing amendment "as a matter of course"). As relevant here, in her First Amended Complaint, Ms. Lucero indicated that in her Title VII discrimination charge before the EEOC, she alleged discrimination "on the basis of race/national origin." J.A., Vol. I, at 11 (First Amend. Compl. for

(continued...)

-4-

¹        (...continued)
Damages Due to Discrimination in Employment Based on Race/National Origin & Age Discrimination, filed Sept. 24, 2009).  And the First Amended Complaint purportedly sought relief under Title VII for those (non-age) forms of discrimination.  *See id.* (noting that "[t]his action is brought [under Title VII] to remedy discrimination on the basis of race/national origin").

Under Title VII, however, race and national origin are distinct bases upon which to rest a discrimination charge.  42 U.S.C. § 2000e-2(a)(1) (making it unlawful "to discriminate against any individual . . . because of such individual's race . . . *or* national origin" (emphasis added)); *see Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (noting that claims of race discrimination and national-origin discrimination are "conceptually distinct" (quoting *Dixit v. City of N.Y. Dep't of Gen. Servs.*, 972 F. Supp. 730, 734 (S.D.N.Y. 1997)) (internal quotation marks omitted)); *see also Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980) ("The use of the word 'or' [in 42 U.S.C. § 2000e-2(a)] evidences Congress' intent to prohibit employment discrimination based on *any or all* of the listed characteristics." (emphasis added)).

That said, we do recognize that, at least in certain factual contexts, the demarcation line separating the two forms of discrimination may be quite faint or virtually indiscernible.  *See Deravin*, 335 F.3d at 201 ("However, courts have also recognized that race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case."); *cf. Daemi v. Church's Fried Chicken*, 931 F.2d 1379, 1387 n.7 (10th Cir. 1991) ("We are cognizant, however, that often the line between national origin discrimination claims under Title VII and racial discrimination claims under § 1981 is 'not a bright one.'" (quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring))).   Indeed, in her First Amended Complaint, Ms. Lucero seems to have viewed the two distinct forms of discrimination as essentially conterminous relative to Sandia's alleged treatment of her.  However, Ms. Lucero was granted leave to file a second amended complaint, *see* Dist. Ct. Doc. No. 77, at 9, and in that document, Ms. Lucero clarified that her EEOC charge only related to discrimination "on the basis of *national origin* and age."  J.A., Vol. I, at 123 (Second Amend. Compl. for Damages Due to Discrimination in Employment Based on National Origin & Age Discrimination, filed Aug. 11, 2010) (emphasis added).  She further indicated that her lawsuit under Title VII related to only national-origin discrimination.  *Id.* at

(continued...)

-5-

Lucero on June 23, 2009. On September 18, 2009, Ms. Lucero filed her original

complaint in the district court asserting those same discrimination claims, plus

several others. After the district court granted in part Sandia's motion to dismiss

and after Ms. Lucero declined to pursue some of her claims, all that remained on

summary judgment were Ms. Lucero's claims that the size of her raises and

---

[1]     (...continued)
122 (noting that "[t]his action is brought [under Title VII] to remedy
discrimination on the basis of national origin").

        We address this matter here because Ms. Lucero's initial conflation in her
First Amended Complaint of the two forms of discrimination (i.e., discrimination
on the grounds of race and national origin) appears to have contributed to a
limited but noteworthy instance of imprecision in the district court's summary-
judgment analysis of her Title VII claim. Because it may engender some
confusion, we point it out. Specifically, the district court's analysis treats the
terms "race" and "national origin" as essentially synonymous and uses them
alternatively throughout its order, in some places referring to the Title VII claim
as relating to national-origin discrimination and, in other places, referring to it as
pertaining to race discrimination. *Compare* J.A., Vol. I, at 272 (noting that "the
issues that remain before the Court are whether the raises in Plaintiff's pay, as
well as the restructuring of her job in 2008, were the result of discrimination
based on Plaintiff's age and *national origin*" (emphasis added)), *with id.* at 275
(noting that "all that remain are [Ms. Lucero's] claims that her raises and the
reorganization of her job were the product of discrimination based on *race* and
age" (emphasis added)). Perhaps reflecting her view that the two forms of
discrimination are in practical terms—if not strictly legal ones—essentially
conterminous under the circumstances of her case, Ms. Lucero has not objected to
the district court's summary-judgment analysis on this ground. However,
consistent with her Second Amended Complaint, Ms. Lucero has confirmed in her
appellate brief that her Title VII claim relates only to national-origin
discrimination. *See* Aplt. Corrected Opening Br. at 3 ("This [a]ppeal contends
that the Court engaged in error when it dismissed via summary judgment
Appellant's claims of age discrimination under the [Age Discrimination in
Employment Act], and of national origin discrimination under Title VII.").

-6-

certain changes in her job responsibilities were the product of discrimination

based on age and on national origin.[2]

Recognizing that Ms. Lucero's case rested on circumstantial evidence, the

district court evaluated her claims under *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973). The disputed issues were whether Ms. Lucero had suffered an

adverse employment action and whether she was treated less favorably than

similarly situated employees who were not in her protected classes.

Regarding the allegedly discriminatory raises, the district court determined

that Ms. Lucero failed to meet her prima facie burden under *McDonnell Douglas*.

The court explained that

> in order to meet her prima facie burden, [Ms.] Lucero must demonstrate that there were in fact other similarly situated . . . employees outside her protected class who received higher raises. This includes more than merely identifying such allegedly similarly situated individuals, but also providing "evidence of

---

[2] Although Ms. Lucero has made other claims against Sandia during the course of this lawsuit, including on appeal, the sole issue that remains after oral argument relates to the size of the raises she received (which were based in part on her performance ratings). *See* Oral Arg. at 12:21–12:32. Notably, at oral argument, Ms. Lucero abandoned her appeal of the district court's summary-judgment ruling on her claim that she was discriminated against when the Safeguards and Security center was reorganized and her job responsibilities were changed. *Se*e Oral Arg. at 11:57–12:32. Consequently, as the case is currently postured, we need not review the district court's decision to exclude from consideration "a sham issue of fact" allegedly presented in Ms. Lucero's affidavit. J.A., Vol. I, at 282; *see Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). The alleged "sham issue" was "whether the reorganization of the [Safeguards and Security center] resulted in an adverse employment action," J.A., Vol. I, at 280, and that issue currently is not before us on appeal, *see* Oral Arg. at 11:41–12:32.

their performance, training, education or skills."

J.A., Vol. I, at 278 (citation omitted) (quoting *Amro v. Boeing Co.*, 232 F.3d 790 (10th Cir. 2000)). The district court determined that because Ms. Lucero had provided no evidence "comparing [Ms.] Lucero's performance, education, skills, and accomplishments . . . to those of other [members of the technical staff] outside the protected class who received higher ratings and higher raises than she received," Ms. Lucero "[could not] demonstrate that she was indeed 'similarly situated' to the other employees." *Id.* at 279.

The court also held that Ms. Lucero "failed to meet her prima facie burden to show that her raises amounted to an adverse employment action," because, according to the court, "the evidence shows that in each year from 2003 to 2008, she received a raise that was within the range of raises given to her peers." *Id.* The court reasoned, "This hardly supports an inference that any of [Ms.] Lucero's raises constituted an adverse employment action, especially absent any evidence comparing her performance, education, and skills to those outside the protected class who received higher raises." *Id.* at 280.

Having determined that Ms. Lucero had not met her burden on the "similarly situated" and "adverse employment action" elements of her prima facie case, the court nevertheless proceeded to address the two remaining steps of the *McDonnell Douglas* analysis. It found that Sandia had articulated a legitimate, non-discriminatory reason for Ms. Lucero's lesser raises, and that the "evidence

of a legitimate, nondiscriminatory reason is undisputed." *Id.* at 284. Finally, the court determined that Ms. Lucero "failed to come forward with evidence that Sandia's explanation of her raises was mere pretext" for unlawful discrimination. *Id.* at 285. The district court granted Sandia's summary-judgment motion in its entirety.

Ms. Lucero timely filed this appeal, and the only issue before us is whether the district court properly entered summary judgment against Ms. Lucero on her age and national-origin claims related to her allegedly discriminatory raises.

## II

## A

We review the district court's order granting summary judgment de novo, and we draw all reasonable inferences in favor of the nonmoving party—in this case, Ms. Lucero. *See Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007). "[S]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Morris v. City of Colo. Springs*, 666 F.3d 654, 660 (10th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)).

Ms. Lucero's only remaining claims of discrimination are that she received lower raises than the younger, non-Hispanic coworkers, because of her age and national origin. Under the Age Discrimination in Employment Act ("ADEA"), it is unlawful for an employer to "discriminate against any individual with respect

to [her] compensation . . . because of such individual's age," 29 U.S.C. § 623(a)(1), if that individual is forty or older, *id.* § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."); *see* 8 Lex K. Larson, *Employment Discrimination* § 120.01, at 120-2 (2d ed. 2011) (noting that the ADEA "forbids age discrimination in employment of persons at least forty years of age" and generally there is "no longer an upper age for protection").  Likewise, under Title VII, it is an unlawful employment practice for an employer "to discriminate against any individual with respect to [her] compensation . . . because of such individual's . . . national origin."  42 U.S.C. § 2000e–2(a)(1); *see, e.g.*, *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012); *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1164 (10th Cir. 2007) (en banc).

Here, there is an absence of direct evidence of discrimination.  Rather, Ms. Lucero has attempted to prove discrimination through circumstantial evidence under the *McDonnell Douglas* framework, which is properly employed in analyzing such evidence under both Title VII and the ADEA.  *See McDonnell Douglas*, 411 U.S. at 802 (Title VII); *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (ADEA).

Ms. Lucero carries the initial burden of establishing a prima facie case of age or national-origin discrimination.  *See McDonnell Douglas*, 411 U.S. at 802.

-10-

Only if Ms. Lucero can make out her prima facie case does the burden shift to Sandia to articulate some legitimate, nondiscriminatory reason for its actions. *See id.* In order to prove her case through circumstantial evidence, Ms. Lucero must show that she was "given a lesser raise[] than other similarly situated non-protected class employees." *Amro*, 232 F.3d at 798.

"[W]hether employees are similarly situated—*i.e.*, whether they are 'similar in all *material* respects,'—is a fact-intensive inquiry, and what facts are material will vary depending on the case." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (citation omitted) (quoting *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1125 (9th Cir. 2009)); *accord Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) ("To determine whether a plaintiff's co-worker was similarly situated for purposes of this analysis, a court must make a 'flexible, common-sense' evaluation of the relevant factors." (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007))). *Compare Moran v. Selig*, 447 F.3d 748, 755–56 (9th Cir. 2006) (holding that the plaintiffs—white baseball players—had failed to establish a prima facie case of disparate treatment under Title VII because the African-American baseball players they used as comparators were not similarly situated; the African-American baseball players had been excluded from playing in the Major Leagues on account of their race, and it was primarily this *material difference* that prompted Major League Baseball to provide a benefit to African-American players that was not available to white

-11-

players), *with McGuinness v. Lincoln Hall*, 263 F.3d 49, 54–55 (2d Cir. 2001) (holding that the plaintiff had established a prima facie case of discrimination under Title VII where both she and a male comparator had been fired, and she alleged discrimination in the amount of severance that she received, because she had "established that she and [the male comparator] held positions of roughly equivalent rank . . . , that [they] were fired at roughly the same time, that the decisions with respect to the severance were both made at the highest levels of the company, and that [the comparator] received considerably more money in severance").

Here, Ms. Lucero has failed to establish her prima facie case, and summary judgment was warranted on that ground. Our decision in *Amro* is particularly instructive. We explained the plaintiff's failing in *Amro* as follows:

> [Mr. Amro] asserts that his pay raise was less than the raises received by 92% of the engineers in his classification. However, he fails to demonstrate that there were in fact other similarly situated engineers outside his protected class who received higher raises. After carefully reviewing the record, we agree with the district court that "although [Mr. Amro] has identified others who allegedly are similarly situated engineers, he has not provided any evidence of their performance, training, education or skills. [Mr. Amro's] own opinion that his performance is excellent does not raise a fact question as to how his performance compares to others." *Amro* [*v. Boeing Co.*, 65 F. Supp. 2d 1170, 1186 (D. Kan. 1999)]; *see also Jones v. Denver Post Corp.*, 203 F.3d 748, 754 (10th Cir. 2000) ("'It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance.'") (quoting *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir.

-12-

> 1996)). In essence, Mr. Amro alleges "[t]he simple fact that [he] did not receive as high a raise as [he] feels he is worth." *Murphy v. Yellow Freight Sys., Inc.*, 832 F. Supp. 1543, 1550 (N.D. Ga. 1993). That is insufficient.

232 F.3d at 798 (first and fourth alterations added).[3] As in *Amro*, Ms. Lucero has failed to provide *any* evidence that the comparators that she has put forth are similarly situated, much less evidence that she and those comparators were similar in all material respects. More specifically, Ms. Lucero has provided *no* evidence regarding the training, education, or skills of the Sandia employees who received higher raises. Mr. Sandoval's testimony underscores the significance of this failing of proof. Mr. Sandoval explained in his deposition that Ms. Lucero's co-workers included employees who "were all doing unique kinds of activities," and that Ms. Lucero was, in some years, "competing [for VOC ratings] against some very highly technical people doing very highly technical work." J.A., Vol. I, at 164 (Dep. of Joseph Sandoval, taken Mar. 31, 2010). In 2005, for example,

---

[3]     A panel of our court reached a similar conclusion in a non-precedential decision. *See Welder v. Univ. of Okla. Bd. of Regents*, 242 F.3d 392, No. 99-6430, 2000 WL 1854132, at *1 (10th Cir. Dec. 19, 2000) (unpublished table case) (affirming the district court's order granting summary judgment on the plaintiff's claim that "the University discriminated against her by paying her a lower salary than male professors in her College," because "the evidence d[id] not show that plaintiff was similarly-situated to any male who received higher pay"); *see also Taher v. Wichita State Univ.*, 526 F. Supp. 2d 1203, 1219 (D. Kan. 2007) (granting summary judgment on the plaintiff's discriminatory pay claim because he had not established that any other employees to whom the defendant had given higher pay raises were similarly situated).

-13-

her co-workers included a staff member who had a doctorate degree in "physics, mathematics and engineering." *Id.* at 163. And others had master's degrees in business administration and one had a master's degree in national security. Ms. Lucero (who only possessed a highschool diploma) failed to offer proof that she was similarly situated to those or other Sandia employees.

At bottom, Ms. Lucero's assertion of a viable prima facie case (regarding the similarly situated component) rests solely on an alleged concession made by Sandia that the other members of the technical staff of Ms. Lucero's workgroup were similarly situated. Sandia attached as an exhibit to its motion for summary judgement information regarding all of the members of the technical staff of the Safeguards and Security center, including their performance ratings, ages, races, salaries, and raises from 2003 through 2008. In its filings, Sandia referred to the other members of the technical staff as Ms. Lucero's "peers." For example, Sandia averred that Ms. Lucero's "salary increases and [VOC ratings] were commensurate with those of her peers." J.A., Vol. I, at 37–38 (Def.'s Mot. for Summ. J., filed July 12, 2010) (referring to the compensation data for all of the members of the technical staff in the Safeguards and Security center); *see also id.* at 44 ("[Ms. Lucero's] raises were not out of step with her peers['']." (capitalization altered)); *id.* at 44–45 ("The lowest raise for [Ms. Lucero's] peer group [in September 2007] was 1.3%."); *id.* at 45 ("Only three of twelve peers

received larger raises than [Ms. Lucero] did [in September 2008] . . . .").[4]

In response to Sandia's motion for summary judgment, Ms. Lucero pointed to the data provided by Sandia to show that she received lower raises than her younger, non-Hispanic counterparts. Regarding the purported concession, she wrote in a footnote: "Sandia cannot argue that [Ms. Lucero's] comparisons are not with 'similarly situated employees' because Sandia identified Plaintiff's 'peers' as the [members of the technical staff], and [Ms. Lucero's] comparison tables are *exclusively* based on [the salary information in Sandia's exhibit]." *Id.* at 149 n.7 (Pl.'s Resp. to Sandia's Mot. for Summ. J., filed Aug. 23, 2010) (emphasis altered).

Ms. Lucero now claims that because Sandia relied on the data regarding the other members of the technical staff in an effort to show that Ms. Lucero was not treated less favorably than younger, non-Hispanic employees, Sandia has conceded that the other members of the technical staff were—in the eyes of the law—similarly situated. Sandia vigorously contests the notion that it made such a concession.

---

[4] Furthermore, in discussing Ms. Lucero's now-withdrawn First Amendment claim, Sandia wrote: "[T]he relevant context is [Ms. Lucero's] raises when viewed against those of her similarly-situated peers who did not engage in the same sort of speech as [Ms. Lucero]. Some of [Ms. Lucero's] raises—as well as her overall salary—were as great as or greater than her peers who did not raise safety concerns." J.A., Vol. I, at 52.

-15-

Sandia essentially argues that it used the term "peers" in referring to the other members of the technical staff because they constituted the conceivable *possible* universe of employees from which Ms. Lucero might endeavor to identify similarly situated employees to establish her prima facie case. And, by "showing that [Ms.] Lucero was not disadvantaged in comparison with her co-workers [i.e., her peers]," Aplee. Br. at 13, who were not members of an age or national-origin protected group, Sandia sought to demonstrate a proof deficiency of Ms. Lucero's prima facie case *and* to shift the burden to her on summary judgment (as the non-movant) to come forward with sufficient evidence—in particular, evidence that she was treated less favorably than similarly situated non-protected employees. This line of argument, insists Sandia, "was not a concession that [Ms.] Lucero's peers [i.e., the other members of the technical staff] were similarly situated to her." *Id.* at 11. In other words, reasons Sandia, it was not conceding that Ms. Lucero actually could successfully identify similarly situated comparators—as that concept is understood in our precedent—(among the other members of the technical staff or otherwise), but instead it was just "shift[ing] the burden onto [Ms.] Lucero to show that she possessed [all] necessary evidence." *Id.* at 12.

In our view, Sandia has the more cogent position in this dispute, and we reject Ms. Lucero's concession claim. In doing so, we acknowledge that Sandia's summary-judgment briefing was not a model of clarity. For example, Sandia did

-16-

not expressly explain its rationale in using the term "peers" (even though it could be gleaned with some attention from the substance and context of its argument), and it cited our decision in *Johnson v. Weld County*, 594 F.3d 1202 (10th Cir. 2010), which at best is only remotely related to the similarly situated prima facie matter. Indeed, in *Johnson*, we "assume[d] without deciding" that plaintiff had established her prima facie case. 594 F.3d at 1211. However, at least one thing was pellucid from Sandia's summary-judgment briefing: Sandia was not relieving Ms. Lucero of her burden to establish that she was treated less favorably than similarly situated comparators. In this regard, Sandia threw down the gauntlet in patent terms, stating that "[Ms. Lucero] could not establish that she was treated less favorably than younger or non-Hispanic Sandians who were similarly situated to herself." Aplee. Br. at 11.[5] At that juncture, it was incumbent upon Ms.

---

[5] Even if we were willing to accept (which we are not) that Ms. Lucero could have reasonably believed that Sandia conceded in its summary-judgment filing that the other members of the technical team were similarly situated to her under the law—and thus relieved her of the proof burden on that element of her prima facie case—Sandia's reply brief would have bluntly disabused her of that notion. In its summary-judgment reply brief, Sandia stated that "it is [Ms. Lucero's] burden at this stage to demonstrate that similarly situated employees were treated more favorably. This is not simply a matter of pointing out non-Hispanics or younger people who received larger raises. It involves establishing that these individuals are similar to [Ms. Lucero] in ways that influence raises." J.A., Vol. I, at 198 (Def.'s Reply in Supp. of Mot. for Summ. J., filed Sept. 14, 2010). Reviewing the overall substance of its argument, Sandia clearly and unequivocally controverted its alleged "concession"—by pointing out that the similarly situated burden of proof fell on Ms. Lucero; by citing *Amro*; and by concluding that Ms. Lucero "has not established a prima facie case of dissimilar

(continued...)

-17-

Lucero to ascertain the legal requirements for similarly situated comparators and identify fellow employees (presumably other members of the technical staff) that qualified under those legal requirements. This she did not do.

In sum, because Ms. Lucero has failed to provide any evidence that she was treated differently from any *similarly situated* employees, who were not in protected classes based on age or national origin, she has failed to make out a prima facie case of discrimination. Accordingly, her claim fails on the first step of the *McDonnell Douglas* burden-shifting analysis. On this ground, we affirm the district court's summary-judgment ruling in favor of Sandia.

## B

There currently is before us one pending motion to seal: specifically, a joint motion of the parties to seal Volume II of the Corrected Joint Appendix.[6] The

---

[5] (...continued) treatment." *Id.* Even if at no other time, when she received Sandia's reply brief, Ms. Lucero was on clear notice that Sandia did *not* concede—and had not conceded—that Ms. Lucero's fellow members of the technical staff were similarly situated. At that point, if Ms. Lucero truly felt she had been misled, she was obliged to take whatever protective steps were necessary to place before the court evidence to support the similarly situated component of her prima facie case (e.g., seeking leave to file a surreply).

[6] Ms. Lucero also filed with us an unopposed motion to seal what she called her "Brief-in-Chief." Pl.'s Unopposed Mot. to Place Her Brief-in-Chief Under Seal at 1 (filed Apr. 8, 2011). The subject of her motion—i.e., the Brief-in-Chief—had been filed on April 4, 2011. Ms. Lucero represented to this Court that the brief contained "certain evidence . . . which had been placed under seal at the District Court and which should not be made available for public disclosure."

(continued...)

clerk's office of our court provisionally granted the motion, pending our final determination. Although we sound a cautionary note, we ultimately grant the motion to seal.

"A party seeking to file court records under seal must overcome a presumption, long supported by courts, that the public has a common-law right of access to judicial records." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1135 (10th Cir. 2011). Accordingly, "the parties must articulate a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process." *Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011); *see Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004) ("[T]hese documents, which related to the court's ruling on a

---

[6]      (...continued)
*Id.* She pledged to "take the necessary steps to correct the matter in her Corrected Brief-in-Chief when it is filed." *Id.* at 2. Our clerk's office provisionally granted this motion to seal, pending our final determination of the matter. Ms. Lucero did file a corrected opening brief, which the clerk's office substituted for her initial Brief-in-Chief. The clerk's office purged the latter document from its files. Accordingly, the original Brief-in-Chief is no longer available in any form to the public in the files of this court. Therefore, we **DENY** the motion to seal as moot. To avoid any confusion, we further note that on the cover of Ms. Lucero's corrected brief, she mistakenly stated that it should be filed under seal subject to the provisional sealing order of our clerk's office, which in fact only related to the *initial* Brief-in-Chief. The clerk's office followed Ms. Lucero's lead and mistakenly filed the corrected brief under seal. At the close of oral argument, the parties suggested that the corrected opening brief should be treated as a public document. *See* Oral Arg. 32:40–59, 34:42–46. The clerk's office subsequently confirmed that this brief was sealed in error and clarified in its records that the corrected opening brief is publicly accessible.

motion for summary judgment, were presumptively subject to public access."); 8A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2042, at 234 (3d ed. 2010) ("The strongest arguments for access apply to materials used as the basis for a judicial decision of the merits of the case, as by summary judgment."); *see also Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1177 (6th Cir. 1983) ("Throughout our history, the open courtroom has been a fundamental feature of the American judicial system. Basic principles have emerged to guide judicial discretion respecting public access to judicial proceedings. These principles apply as well to the determination of whether to permit access to information contained in court documents because court records often provide important, sometimes the only, bases or explanations for a court's decision.").

In their joint motion, by way of justification, the parties simply stated, "The documents in Volume II of the Corrected Joint Appendix consist of documents that were filed under seal in the district court pursuant to a court order." Joint Mot. to File Vol. II of Corrected J.A. Under Seal at 2 (filed Apr. 18, 2011). The parties included with the motion a copy of the district court's one-page sealing order, in which the court summarily noted that it was sealing evidence with Ms. Lucero's date of birth and evidence with confidential information.

At the outset, in light of the well-settled presumption against denying

public access to judicial documents, we feel obliged to underscore that parties should not routinely or reflexively seek to seal materials upon which they predicate their arguments for relief, particularly dispositive relief such as summary judgment. Furthermore, a district court's decision to seal certain pleadings or evidence certainly is not controlling with respect to our independent determination to maintain the same items under seal on appeal. Accordingly, parties would be well advised to affirmatively offer justifications for the continued sealing of materials. This did not happen here: the parties sole proffered justification for sealing Volume II of the Corrected Joint Appendix was that the district court had elected to seal the items that were in that volume.

Nonetheless, to better assess the merits of the pending motion to seal Volume II, we have taken the initiative of reviewing certain filings in the district court related to the sealing question. They reveal that the documents sought to be sealed contain confidential information relating to Sandia's personnel and business practices—in particular its method of determining compensation and the actual compensation of certain nonparty employees. As the district court noted in describing one such sealed document in its summary-judgment ruling, it contains

> detailed information regarding the name, age, ethnicity, salary, VOC rating, base pay, and non-base pay of each of the other [members of the technical staff] in [Ms.] Lucero's organization from 2003 to 2008, as well as information regarding how well each of them was compensated as compared with the private market for individuals with similar skills, and the rate at which

each was compensated compared to Sandia peers.

J.A., Vol. I, at 278 n.4.  Further, in Volume II, there is an excerpt from the transcript of Ms. Lucero's deposition, in which she gives the exact date of her birth.[7]

In light of our investigation of the merits of the pending motion to seal, we conclude that the parties' confidentiality concerns are sufficiently weighty that Volume II of the Corrected Joint Appendix should remain under seal.  *See Sorenson Commc'ns, Inc. v. FCC*, 659 F.3d 1035, 1041 n.4 (10th Cir. 2011) (making orders to seal the parties' briefs and a portion of the joint appendix permanent "to protect confidential information relating to [the defendant's] finances and business practices").  Therefore, we maintain the seal imposed provisionally by our clerk's office with respect to Volume II of the Corrected Joint Appendix.[8]

_____

[7]    The federal rules provide protections against the public disclosure of more than the year of birth.  *See, e.g.*, Fed. R. Civ. P. 5.2(a)(2); Fed. R. App. P. 25(a)(5).

[8]    In contrast to the documents themselves contained in Volume II, we note that we would not have shied away from disclosures of the *information* contained in the documents, if it had proved *necessary* for our disposition of this appeal. *Compare Qwest Corp. v. FCC*, --- F.3d ----, 2012 WL 3156451, at *2 n.1 (10th Cir. Aug. 6, 2012) (referencing sealed documents in the record, but only referring to confidential numerical data in general terms and electing "not [to] supply precise figures, as they are redacted in the publicly accessible documents" partly *because* we saw "no *need* to do otherwise" (emphasis added)), *with United States v. Strache*, 202 F.3d 980, 987 (7th Cir. 2000) (observing that where a

(continued...)

-22-

## III

Because Ms. Lucero has failed to make out a prima facie case of discrimination, we **AFFIRM** the judgment of the district court. In addition, we **GRANT** the parties' joint motion to seal Volume II of the Corrected Joint Appendix.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge

---

[8]      (...continued)
district court has adopted the findings of a sealed pre-sentence report, it is appropriate (i.e., necessary) to address those findings, in order to resolve challenges to the district court's sentencing decisions). The public's interest in access to the grounds for judicial decision-making would have warranted at least that much. Indeed, the district court followed such a course in its summary-judgment ruling—disclosing limited information in sealed documents that was necessary to its ruling, including general information regarding Sandia's personnel data. *See* J.A., Vol. I, at 278 n.4 ("Due to the private nature of such information [in sealed documents], the Court will discuss the data generally but will not refer to any of those individuals by name."). The parties have not objected to the district court's approach, and they would be hard-pressed to do so. Benefitting from the district court's very limited general disclosures of information in the sealed documents, in resolving the issues in this appeal, we have felt no need to make further disclosures of information found in the sealed documents, and we have endeavored scrupulously not to do so.